971 F.2d 219
 35 ERC 1609, 22 Envtl. L. Rep. 21,274
 COALITION FOR CLEAN AIR; Sierra Club, Inc., Plaintiffs-Appellants,
v.
United States Environmental Protection Agency, Defendant-Appellee,
and
South Coast Air Quality Management District, Defendant-Intervenor,
v.
SOUTHERN CALIFORNIA EDISON COMPANY; Southern California Gas
Company; Southern California Association of
Governments, Plaintiff-Intervenors.
COALITION FOR CLEAN AIR; Sierra Club, Inc., Plaintiffs-Appellees,
Southern California Edison Company; Southern California Gas
Company; Southern California Association of
Governments, Plaintiff-Intervenors-Appellees,
v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,
Defendant-Intervenor-Appellant,
United States Environmental Protection Agency, et al., Defendants.
COALITION FOR CLEAN AIR; Sierra Club, Inc., Plaintiffs-Appellants,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant-Appellee,
v.
SOUTHERN CALIFORNIA EDISON COMPANY, Plaintiff-Intervenor-Appellee.
 Nos. 91-55383, 91-55386 and 91-55634.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1992.*
Decided July 1, 1992.
 
 Alan Waltner, Gorman & Waltner, Oakland, Cal., for plaintiffs-appellants-appellees.
 Colin Lennard, Morrison & Foerster, Los Angeles, Cal., for plaintiffs-intervenors-appellants-appellees.
 Karen L. Egbert, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee-appellant.
 Peter M. Greenwald, Dist. Counsel, Diamond Bar, Cal., for defendant-intervenor-appellant.
 Joseph J. Brecher, Oakland, Cal., Michael D. Rowe, Environment and Natural Resources Div., Washington, D.C., Mary L. Grad, Asst. U.S. Atty., Sacramento, Cal., for amici curiae.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN, NORRIS and NOONAN, Jr., Circuit Judges.
 WILLIAM A. NORRIS, Circuit Judge:
 
 
 1
 California's South Coast Air Basin has the dirtiest air in the United States.[1] Twenty-two years have passed since Congress first enacted legislation requiring implementation plans to attain national air quality standards, and yet today the South Coast still lacks implementation plans for ozone and carbon monoxide. In 1989, EPA entered into a settlement agreement with appellants requiring it to perform its statutory duty and promulgate federal implementation plans for the South Coast on an expeditious schedule. EPA now argues that, when Congress passed the Clean Air Act Amendments of 1990, it relieved EPA of this obligation and returned the implementation plan process to square one. We disagree and reverse the district court's decision vacating the settlement agreement and dismissing the case. Coalition for Clean Air v. EPA, 762 F.Supp. 1399 (C.D.Cal.1991). We remand to the district court for reinstatement of the agreement and direct the court to establish an expeditious schedule for EPA to promulgate final implementation plans for the South Coast.
 
 
 2
 * The Clean Air Act was passed in 1963, but it was the Clean Air Amendments of 1970, Pub.L. No. 91-604, 84 Stat. 1676 (1970), that gave the Clean Air Act the basic structure it retains today. See generally Train v. NRDC, 421 U.S. 60, 63-64, 95 S.Ct. 1470, 1474-1475, 43 L.Ed.2d 731 (1975) (discussing pre-1970 statutes). The 1970 Amendments created "a federal-state partnership for the control of air pollution." Abramowitz v. EPA, 832 F.2d 1071, 1073 (9th Cir.1987). Section 109 of the Act, as amended, directed EPA to establish National Ambient Air Quality Standards ("NAAQS") for any air pollutants that might endanger public health or welfare. Clean Air Act ("CAA") § 109, 84 Stat. at 1679-80. EPA issued NAAQS for six pollutants in 1971, including carbon monoxide ("CO") and ozone.[2] Responsibility for meeting these standards fell, in the first instance, to the states, which were required to submit State Implementation Plans ("SIPs") by 1972 that would provide for attainment of the NAAQS by 1975. CAA § 110(a)(1), 84 Stat. at 1680. EPA was required to review the SIPs and to disapprove any that failed to meet the requirements of the Act, including the attainment of NAAQS by the statutory deadline. CAA § 110(a)(2), 84 Stat. at 1680-81. If EPA disapproved a SIP, the 1970 Amendments required that EPA adopt a Federal Implementation Plan ("FIP") that would meet the requirements of the Act and take the place of the disapproved SIP. CAA § 110(c), 84 Stat. at 1681-82.
 
 
 3
 In February 1972, California submitted a SIP for the South Coast to EPA. On May 31, 1972, EPA announced its disapproval of major portions of the SIP. 37 Fed.Reg. 10,842, 10,851-10,855 (1972). At that point, EPA was statutorily required to adopt a FIP for the South Coast but failed to act. As the result of a citizens' suit, EPA was placed under a court order to prepare a FIP by January 15, 1973 that would provide for attainment of NAAQS no later than 1977. Riverside v. Ruckelshaus, Civ. No. 72-2122-H, 4 Envt'l Rep.Cas. (BNA) 1728, 1731 (C.D.Cal. Nov. 16, 1972). During 1973, EPA issued several proposed FIPs that contained extreme provisions including gas rationing. See, e.g., 38 Fed.Reg. 2194, 2194-2200 (1973); 38 Fed.Reg. 31,232, 31,232-31,255 (1973). On October 15, 1976, EPA revoked its proposed gas rationing regulations, which were due to take effect in 1977, because of "the seriously disruptive social and economic consequences of such regulations," in spite of the fact that the revocation would "render the affected [implementation plans] defective as a legal matter, since such [plans] will no longer contain regulations which provide for NAAQS attainment." 41 Fed.Reg. 45,565 (1976).
 
 
 4
 Faced with widespread failure by the states to attain NAAQS, Congress amended the Clean Air Act again in 1977, to give "nonattainment" areas more time. Pub.L. No. 95-95, 91 Stat. 685 (1977). The deadline for NAAQS attainment was extended to 1982. CAA § 172, 91 Stat. at 746-48. On July 25, 1979, California submitted a SIP for the South Coast Air Basin requesting an extension of the ozone and CO attainment dates to 1987. EPA proposed to disapprove the SIP because California had failed to adopt a motor vehicle inspection and maintenance program, which was required as a condition for granting such an extension. 45 Fed.Reg. 21,271, 21,271-21,282 (1980). EPA took final action disapproving the SIPs for ozone and CO on January 21, 1981. 46 Fed.Reg. 5965, 5975 (1981).
 
 
 5
 In 1982, California submitted extensive revisions to its proposed South Coast SIPs for ozone and CO. These 1982 proposed SIPs acknowledged that even if the plans were fully implemented, the South Coast would fail to attain the ozone and CO NAAQS by 1987. 48 Fed.Reg. 5074, 5082-5083 (1983). On February 3, 1983, EPA proposed to disapprove the 1982 SIPs. Id. at 5074. California submitted further revisions, and EPA took final action on July 30, 1984, approving the CO and ozone control measures without requiring any demonstration that those measures would achieve attainment by the statutory deadline. EPA simply noted that it was deferring any final approval or disapproval of the SIP's attainment provisions. 49 Fed.Reg. 30,300, 30,305 (1984); see Abramowitz, 832 F.2d at 1074.
 
 
 6
 In September 1984, a citizen timely petitioned this court for review of the EPA's 1984 decision. We held that "EPA exceeded its authority under the Clean Air Act by approving the control measures without determining whether those measures would demonstrate attainment by the December 31, 1987 statutory deadline." Abramowitz, 832 F.2d at 1072-73. We remanded "with the specific instruction that EPA disapprove the relevant portions of the SIP and face up to implementing the measures which are to be triggered by failure to meet attainment requirements." Id. at 1073. In compliance with our order, EPA disapproved the South Coast SIPs for ozone and CO on January 22, 1988, triggering once again EPA's statutory obligation to adopt FIPs for the South Coast Air Basin. 53 Fed.Reg. 1780 (1988).
 
 
 7
 On February 22, 1988, appellants Coalition for Clean Air and the Sierra Club filed this citizens' suit to enforce EPA's obligation to promulgate ozone and CO FIPs for the South Coast. In March 1989, EPA entered into a settlement agreement with plaintiffs, which obligated it to prepare, propose, and promulgate final FIPs for the South Coast. Because of the 1989 San Francisco earthquake, the district court extended EPA's deadline for publishing the proposed FIPs from April 30 to July 31, 1990. EPA finally published the proposed FIPs on September 5, 1990, and agreed to finalize them by February 28, 1991. 55 Fed.Reg. 36,458, 36,458-36,576 (1990).
 
 
 8
 In the meantime, EPA sought across-the-board relief from its statutory obligation to promulgate FIPs from Congress, which had begun to consider new amendments to the Clean Air Act. In September 1989, at EPA's urging, the Senate passed an amendment that would have left promulgation of FIPs to EPA's discretion. See S. 1630, 101st Cong., 1st Sess., § 105 (1989). In May 1990, a House Committee deleted this language, which prompted a letter from EPA Administrator Reilly complaining that the House action would require promulgation of a FIP imposing "across-the-board, draconian measures devastating the country's largest industrial area," an obvious reference to the South Coast Air Basin. 136 Cong.Rec. H2771, H2887 (daily ed. May 23, 1990). However, Administrator Reilly's complaint went unheeded by Congress. The House language retaining EPA's mandatory obligation to promulgate a FIP whenever it disapproves a SIP was ultimately enacted by Congress and signed into law by President Bush on November 15, 1991 as part of the Clean Air Act Amendments of 1990. Pub.L. No. 101-549, 104 Stat. 2399 (1990).
 
 
 9
 On November 30, 1991, EPA filed a motion asking the district court to vacate the settlement agreement and dismiss the case on the basis of the 1990 Amendments. EPA argued that Congress could not have intended to continue EPA's obligation to promulgate FIPs for the South Coast under the settlement agreement because the 1990 Amendments contained new criteria and new timetables for attainment, which EPA claimed the states must address in the first instance. Under EPA's interpretation of the 1990 Amendments, its mandatory obligation to promulgate FIPs would be triggered only if California failed to submit adequate SIPs under the new deadlines. The earliest date FIPs would be required for the South Coast under this interpretation of the 1990 Amendments is April 15, 1998. The district court granted EPA's motion to vacate the settlement agreement and dismissed the case. This appeal followed.[3]
 
 
 10
 Appellants make two arguments in support of their position that EPA is currently obligated to promulgate ozone and CO FIPs for the South Coast. First, they argue that § 110(c)(1)(B) of the Clean Air Act, as amended, did not relieve EPA of its obligation to promulgate these FIPs. Second, they argue that even if § 110(c)(1) had been amended to relieve EPA of its FIP obligation, the Amendments' Savings Clause--s 193 of the Clean Air Act--would have preserved EPA's obligation under the settlement agreement. Because we hold that § 110(c)(1)(B) imposes a current obligation on EPA to promulgate ozone and CO FIPs for the South Coast, we do not reach the Savings Clause question.
 
 II
 
 11
 EPA's statutory obligation to promulgate FIPs is contained in § 110(c)(1) of the Clean Air Act, as amended in 1990:
 
 
 12
 The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator--
 
 
 13
 (A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under section 7410(k)(1)(A) of this title, or
 
 
 14
 (B) disapproves a State implementation plan submission in whole or in part,unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.
 
 
 15
 42 U.S.C. § 7410(c)(1). Appellants contend that under subsection (B), EPA is obligated to promulgate ozone and CO FIPs for South Coast based on its disapproval in January 1988 of California's proposed SIPs. EPA, on the other hand, contends that § 110(c)(1), as amended in 1990, was intended to operate prospectively only, so that EPA's obligation to promulgate a FIP for the South Coast will be triggered only if California fails to submit a SIP that meets the requirements of the Clean Air Act by the deadlines set forth in the 1990 Amendments.
 
 
 16
 * We begin with the language of the provision: "The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator ... disapproves a State implementation plan submission in whole or in part." This language is not, by its terms, limited to EPA's disapproval of "newly submitted" SIPs or SIPs "submitted under the 1990 Amendments." Instead it refers to disapproval of state implementations plans generally, either in whole or in part. EPA must promulgate a FIP within two years of such disapproval, unless the state submits and EPA approves revisions to the SIP that correct the deficiency. Since EPA disapproved the South Coast SIPs in January 1988, the statute on its face requires EPA to promulgate FIPs for the South Coast by January 1990.[4]
 
 
 17
 We recognize that EPA's obligation under § 110(c)(1) is put in the future tense. However, the time referred to by the word "shall" is two years from any of the triggering events listed in the provision, not two years from enactment of the 1990 Amendments.[5] Triggering event (A) actually includes two separate events: (1) EPA's finding that a state has failed to make a required submission, and (2) EPA's finding that a submission fails to meet the minimum criteria for completeness established under § 7410(k)(1)(A). Since § 7410(k)(1)(A) was added by the 1990 Amendments, it appears that the second of these findings could only occur after enactment of the 1990 Amendments. However, neither the first of these findings nor triggering event (B)--disapproval of "a State implementation plan submission in whole or in part"--contains any similar temporal limitation. Since these events could occur in the past or in the future, the use of the future tense "shall" to express EPA's obligation does not indicate Congress' intent that § 110(c)(1) operate prospectively only. In other words, if "disapproves" refers to past disapprovals as well as to future ones, "shall" is the appropriate word to describe obligations which may already have been triggered as well as those which may be triggered in the future.
 
 
 18
 However, EPA argues that the word "disapproves" cannot refer to past disapprovals because it is phrased in the present tense. EPA relies heavily on Gwaltney v. Chesapeake Bay Found., Inc., 484 U.S. 49, 57-59, 108 S.Ct. 376, 381-382, 98 L.Ed.2d 306 (1987), in which the Supreme Court interpreted a provision authorizing citizens' suits against persons "alleged to be in violation of" pollution permits as requiring continuous or intermittent violations. However, that case involved more than use of the present tense. It also involved the phrase "in violation," which, coupled with the present tense, suggests a focus on current violations that use of the present tense by itself would not. Moreover, EPA's argument proves too much. As appellants point out, the Clean Air Act, as amended, uses the present tense frequently. For example, Congress uses the present tense to establish criminal liability for "[a]ny person who knowingly--(A) makes any false material statement, ... (B) fails to notify or report as required under this Act; ..." 42 U.S.C. § 7413(c)(2) (emphasis added). Yet clearly the 1990 Amendments do not forgive criminal violations that occurred prior to the Amendments just because Congress speaks in the present tense. The present tense is commonly used to refer to past, present, and future all at the same time. We believe that Congress used the present tense word "disapproves" because it did not wish to limit § 110(c)(1)(B)'s reach to either past or future disapprovals.
 
 
 19
 Unlike Judge Noonan, we attach no weight to the fact that Congress chose to repeal an awkwardly drafted § 110(c)(1) and replace it with a clearer version. See Dissent at 230-31.[6] The new § 110(c)(1) contains the same triggering events as the old § 110(c)(1).[7] Judge Noonan asserts that subsection (B) of the amended § 110(c)(1) is new, see Dissent at 232, but it is not. The current subsection (B) merely incorporates the old subsection (B), which required promulgation of a FIP when a SIP was determined not to meet the requirements of the Act. See 84 Stat. at 1681-82. Judge Noonan also focuses on the fact that the 1990 Amendments added a new triggering event: EPA's finding that a submission fails to meet the minimum criteria for completeness established under § 7410(k)(1)(A). See Dissent at 231. He says there is no reason to ignore subsection (A) in interpreting subsection (B). Id. at 232. The problem with this analysis is that Congress put the word "or" between (A) and (B). Indeed, Congress put the word "or" between the two separate triggering events contained in subsection (A). Clearly Congress intended that EPA's obligation to promulgate a FIP would be triggered by any one of the three triggering events contained in § 110(c)(1) as amended.
 
 
 20
 In short, the plain language of § 110(c)(1)(B) supports appellants' contention that EPA is currently obligated to promulgate FIPs for the South Coast based on its January 1988 disapproval of California's proposed SIPs.
 
 B
 
 21
 EPA also argues that requiring it to promulgate FIPs for the South Coast at this time would be inconsistent with the 1990 Amendments as a whole because those Amendments impose new deadlines and change certain requirements of the Clean Air Act. The district court found this argument persuasive. It reasoned that if the Act were interpreted to continue EPA's existing obligation to promulgate FIPs for the South Coast, "there would be the anomaly that the SIP prepared by the State under the former criteria and rejected is to be replaced by a FIP prepared under new criteria that the State has never had an opportunity to address." Coalition for Clean Air, 762 F.Supp. at 1401. Of course, the proper contents of FIPs for the South Coast are not before us, and we need not decide whether EPA would be required to meet any additional requirements imposed by the 1990 Amendments in promulgating FIPs for the South Coast. The sole question on appeal is whether EPA's obligation to promulgate such FIPs survived the 1990 Amendments. We therefore consider the 1990 changes in the Act's deadlines and requirements for the limited purpose of deciding whether an "anomaly" would result from enforcing the plain language of § 110(c)(1)(B).
 
 
 22
 On closer inspection, we find that no such anomaly exists. EPA points to the fact that the 1990 Amendments extend the deadlines for attainment of ozone and CO standards for the South Coast until 2010 and 2000 respectively. 42 U.S.C. § 7511(a)(1); id. § 7512(a)(1). Yet the FIP that EPA has proposed to adopt for the South Coast, ostensibly under the requirements of the old Clean Air Act, provided for attainment of these standards on precisely the same schedule. 55 Fed.Reg. 36,458, 36,500 (1990). Thus, EPA cannot claim that continuing its obligation to promulgate a FIP for the South Coast will deny the region any extra time to which they would be entitled under the 1990 Amendments.[8]
 
 
 23
 EPA also argues that the 1990 Amendments require new measures to control oxides of nitrogen (NOx) and volatile organic compounds (VOCs), which are precursors of ozone, which the state must address in the first instance. 42 U.S.C. § 7511a(f). However, there is no reason the state may not propose these new measures as revisions to the FIP under the timetables provided in the 1990 Amendments just as the state would be required to do if a FIP had been in effect when those Amendments were adopted. See 42 U.S.C. § 7511a(e). Appellants have not argued that EPA's continuing obligation to promulgate FIPs relieves the state of any new obligations imposed by the 1990 Amendments.
 
 
 24
 Finally, EPA points out that the 1990 Amendments authorize it, under certain conditions, to approve SIP provisions for the attainment of ozone standards for the South Coast that anticipate new control techniques or the improvement of existing techniques and base attainment on the use of such technological advances. 42 U.S.C. § 7511a(e)(5). This new provision may allow EPA to approve some parts of the ozone SIP that it disapproved in 1988, and Judge Noonan points out that it would "make nonsense" of the 1990 Amendments not to give effect to this provision. See Dissent at 232. However, under § 110(c)(1), EPA has authority to approve a SIP that meets the requirements of the Act at any time prior to the actual promulgation of a FIP. 42 U.S.C. § 7410(c)(1). Thus, there appears to be nothing to stop EPA from allowing California to rely on anticipated technology by approving SIP provisions that now meet the requirements of the Act.
 
 
 25
 Running throughout EPA's argument is the notion that federal involvement necessarily preempts state planning to control air pollution. However, this is a misconception. The Clean Air Act creates "a federal-state partnership for the control of air pollution," Abramowitz v. EPA, 832 F.2d at 1073, which continues after EPA's obligation to promulgate a FIP has been triggered.[9] As we have just observed, the state may propose and EPA may approve revisions to a proposed SIP that meet the requirements of the Act at any time prior to the actual promulgation of a FIP. 42 U.S.C. § 7410(c)(1).[10] Even after a FIP is promulgated, the states remain responsible for submitting revisions to the FIP if EPA changes the air quality standards, see 42 U.S.C. § 7410(a)(1), or if Congress changes the provisions of the Act, see, e.g., 42 U.S.C. § 7511a(e).[11] Thus, we fail to see how enforcing the plain terms of § 110(c)(1)(B) will create an unintended anomaly.
 
 C
 
 26
 Although the language of § 110(c)(1)(B) is clear on its face, EPA contends that statements by Senators Baucus and Chafee relating to § 193--the Savings Clause--demonstrate Congress' intent to relieve EPA of its obligation to promulgate FIPs for the South Coast. We reject this contention for several reasons. First, there is no need to refer to the legislative history of a statute when the language of the statute is clear. Toibb v. Radloff, --- U.S. ----, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991). Second, the statements of individual legislators are entitled to little, if any, weight. "[I]t is the official committee reports that provide the authoritative expression of legislative intent.... Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill." In re Kelly, 841 F.2d 908, 912 n. 3 (9th Cir.1988); United States v. Shaw, 936 F.2d 412, 416 (9th Cir.1991). Third, we do not think that the statements by Senators Baucus and Chafee support the EPA's interpretation.
 
 
 27
 Senator Baucus made the following statement on the floor of the Senate during its final debate on the 1990 Amendments:
 
 
 28
 The savings clause in the new legislation is intended to ensure that no backsliding occurs from implementation of adopted, currently feasible measures that EPA has approved as part of a SIP in the past, or currently feasible measures that EPA has added to state plans on its own initiative or pursuant to a court order of settlement, including a Federal Implementation Plan. We do not intend that this savings clause requires EPA to finalize the Federal Implementation Plan in California and preempt the states and regional air quality planning that is ongoing in the Los Angeles area and will otherwise be required under this legislation. If EPA were to promulgate complete new plans based on requirements of the old Act, the areas subject to those federal plans would be deprived of the opportunity to use the significantly revised and clearly more workable requirements of the new legislation. We agree that this would be unreasonable, particularly since the proposed FIP fails to recognize the critical role that local governments play in reducing transportation-related emissions.
 
 
 29
 The savings clause provides EPA with significant discretion with respect to FIPs in California. EPA has the obligation to adopt control measures for sources which it exclusively controls when those controls are necessary to help attain national standards or meet other requirements of the Act. But, beyond that, EPA should complete ongoing FIP processes only for the purposes of ensuring that the standards are met by the statutory deadlines.
 
 
 30
 136 Cong.Rec. S16970 (daily ed. Oct. 27, 1990). Senator Chafee made an almost identical statement. See 136 Cong.Rec. S17,237 (daily ed. Oct. 27, 1990). EPA relies on the portion of Senator Baucus' statement that says "[w]e do not intend that this savings clause requires EPA to finalize the Federal Implementation Plan in California...." It is clear from what follows this statement, however, that Senator Baucus' concern is that the FIP not "preempt the states and regional air quality planning that is ongoing in the Los Angeles area and will otherwise be required under this legislation." As we noted in part II.B, supra, maintaining EPA's obligation to promulgate ozone and CO FIPs for the South Coast will not have the effect of preempting state planning or the new state submissions that are required under the 1990 Amendments. Moreover, if EPA's interpretation of Senator Baucus' statement is correct, it is difficult to understand his reference towards the end of the statement to EPA's completing "ongoing FIP processes."
 
 
 31
 EPA's interpretation is also contradicted by another piece of legislative history that relates specifically to § 110(c)(1) rather than to the Savings Clause. In May, 1990, when the House deleted language that would have made EPA's obligation to promulgate FIPs discretionary, EPA Administrator Reilly wrote to House Speaker Foley:
 
 
 32
 The House has [deleted] language that relieved EPA of its current obligations to complete federal implementations plans (FIP's). If current FIP obligations are not relieved, EPA must impose across-the-board, draconian measures devastating the country's largest industrial area. In light of the new regime for state plan submissions, it makes no sense for EPA to impose FIPs before the states have had a chance to meet their new obligations. For these reasons, the Administration strongly objects to the Committee's approach.
 
 
 33
 136 Cong.Rec. H2771, H2887 (daily ed. May 23, 1990). Thus, EPA complained directly to Congress that unless the language of § 110(c)(1) were changed, EPA would have to promulgate FIPs for the South Coast. However, Congress declined to change the language of the statute. At a minimum, this letter and Congress' response to it show that it is not inconsistent with Congress' intent to require completion of ongoing FIP processes since Congress adopted language that EPA said would have precisely that effect. We may only speculate about what Congress would think of EPA's current litigation position, which directly contradicts its representation to Congress.
 
 D
 
 34
 EPA also argues that we should defer to its interpretation of the statute because it is the administering agency. See Chevron USA Inc. v. NRDC, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). Under Chevron, we are required first to exhaust the "traditional tools of statutory construction" to determine if Congress has spoken to the precise question at issue. Id. at 843 n. 9, 104 S.Ct. at 2781 n. 9. "If the intent of Congress is clear, that is the end of the matter." Id. at 842-43, 104 S.Ct. at 2781-82. In this case, the plain language of § 110(c)(1) expresses Congress' intent that EPA promulgate a FIP when it has previously disapproved a SIP.
 
 
 35
 However, even if we were to conclude that Congress had no intent on the question, it is doubtful that EPA's interpretation of § 110(c)(1) would be entitled to deference. Its current interpretation is in direct conflict with the interpretation that it expressed to Congress. See INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, n. 30, 94 L.Ed.2d 434 (1987); Watt v. Alaska, 451 U.S. 259, 272-73, 101 S.Ct. 1673, 1680-81, 68 L.Ed.2d 80 (1981). This is not a case in which the agency's change of interpretation reflects accumulated experience or responds to changing circumstances. See Rust v. Sullivan, --- U.S. ----, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991). Nor has the agency justified this change with "reasoned analysis." Id. This is simply a case in which the agency, having failed to get Congress to adopt its position, asks the court to do what Congress would not.
 
 E
 
 36
 In sum, we hold that EPA is currently obligated to promulgate ozone and CO FIPs for the South Coast under the plain terms of § 110(c)(1)(B) based on its disapproval of California's proposed SIPs in January 1988. Accordingly, we reverse the decision of the district court. We remand with instructions that the district court reinstate the settlement agreement and establish an expeditious schedule for the promulgation of final FIPs for the South Coast. In establishing the schedule, the district court should bear in mind that promulgation of these FIPs has already been delayed far beyond the statutory deadline, that EPA has already published proposed FIPs for the South Coast, and that the deadline for promulgation of final FIPs was only three months away when EPA moved to vacate the settlement agreement.
 
 III
 
 37
 We turn last to the question of attorney's fees. In an unpublished order, the district court denied appellants' motion for fees in large part. We review the award or denial of attorney's fees for abuse of discretion, but any elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable de novo. Keith v. Volpe, 833 F.2d 850, 854 (9th Cir.1987). We will reverse if the district court misperceives or misapplies the law governing fee awards. Ackerley Communications v. City of Salem, 752 F.2d 1394, 1396 (9th Cir.1985).
 
 
 38
 The district court denied appellants fees against EPA for their work opposing the motion to vacate the settlement agreement and dismiss the suit on the ground that appellants had not prevailed in that stage of the litigation. In light of appellants' success on appeal, we hold that they are entitled to fees for their work below. "[A] plaintiff who is unsuccessful at a stage of litigation that was a necessary step to [its] ultimate victory is entitled to attorney's fees even for the unsuccessful stage." Cabrales v. County of Los Angeles, 935 F.2d 1050, 1053 (9th Cir.1991).
 
 
 39
 The district court also denied appellants fees against EPA for their work opposing EPA's motion to extend the deadlines under the settlement agreement for the proposed and final FIPs. The district court granted EPA's motion to extend the deadline for the proposed FIPs because of the disruption caused by the 1989 San Francisco earthquake. It denied without prejudice EPA's motion to extend the deadline for the final FIPs. The district court concluded that appellants' opposition to the motions was both unsuccessful and unreasonable. We hold that the district court did not abuse its discretion in doing so.
 
 
 40
 The district court awarded fees against EPA for only 24 hours of work preparing the motion for fees because the court thought it was unreasonable for appellants to move for fees without first attempting a fee settlement. However, local rules do not require parties to confer before filing for fees. In fact, local rule 16.10 requires that motions for fees be filed within 30 days of judgment. Furthermore, in their motion for fees, appellants invited EPA to make an offer regarding fees rather than litigate the matter. EPA responded by choosing to litigate. The Supreme Court has stated that "[i]deally, of course, litigants will settle the amount of the fee." Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). However, this preference for settlement is not embodied in any binding rule. The district court's decision to limit fees for the fee motion on the basis that appellants failed to attempt settlement elevates this preference to the status of a court rule. As such, the decision is a misapplication of law that is not shielded under the abuse of discretion standard. See Ackerley, 752 F.2d at 1396. We hold that the district court erred in limiting the fees for preparing the fee motion to 24 hours. EPA's argument that these fees should be reduced because the fee motion was only partially successful should be addressed to the district court on remand.
 
 
 41
 Finally, the district court denied appellants fees against Southern California Edison for their work opposing Edison's intervention of as plaintiff.[12] The language of 42 U.S.C. § 7604(d) does not preclude an award of fees against a private intervenor. However, "special care" is called for when awarding fees against a private party rather than a government entity because of "[d]iffering abilities to bear the cost of legal fees and differing notions of responsibility for fulfilling the goals of the Clean Air Act." Ruckelshaus v. Sierra Club, 463 U.S. 680, 692 n. 12, 103 S.Ct. 3274, 3281 n. 12, 77 L.Ed.2d 938 (1983). The D.C. Circuit has held that fees against a private intervenor are not appropriate if the intervenor "took a position that reasonably attempted to advance the implementation of the Act." NRDC v. Thomas, 801 F.2d 457, 462 (D.C.Cir.1986); Sierra Club v. EPA, 769 F.2d 796, 810 (D.C.Cir.1985). We believe this test is sound. Applying it to the facts of this case, we hold that appellants are not entitled to fees against Edison. While Edison's position differed in many respects from the position advanced by appellants, it was reasonably consistent with advancing the implementation of the Clean Air Act. Accordingly, we affirm the district court's decision denying fees against plaintiff-intervenor Edison.
 
 IV
 
 42
 For the reasons stated herein, the decision of the district court vacating the settlement agreement and dismissing the case is REVERSED. The case is REMANDED for reinstatement of the agreement. On remand the district court is instructed to establish an expeditious schedule for promulgation of final ozone and CO FIPs for the South Coast consistent with this opinion. The district court's order denying attorney's fees is AFFIRMED in part and REVERSED in part.
 
 NOONAN, Circuit Judge, dissenting:
 
 43
 This case turns on the meaning of an act of Congress. In determining that meaning we need not go beyond the text if, as I believe, the text is clear. In particular, I see no need to rely on the statements of Senators Baucus and Chafee or to take into account the statement, made in the course of legislative bargaining in May 1990, by EPA Administrator Reilly. These statements serve only to confirm what anyone would know, that Congress was acutely aware of the air pollution problem of the South Coast and legislated with that problem in mind. The meaning of the statute, however, does not depend on the Senators' or the Administrator's gloss.
 
 
 44
 The Background Litigation.
 
 
 45
 On January 22, 1988, EPA disapproved California's SIPs for the South Coast ozone and carbon monoxide levels. On February 22, 1988 the Coalition for Clean Air and the Sierra Club ("the Coalition") brought suit against EPA seeking an order under the Clean Air Act Amendments of 1970 (the 1970 Amendments), directing EPA under 42 U.S.C. § 7410(c) of the Act to prepare, propose and promulgate a FIP for the South Coast that would provide for the attainment of the then existing air standards for ozone and carbon monoxide. On February 13, 1989, the parties entered into a "Stipulation and Agreement of Partial Settlement" ("the Settlement"). The EPA agreed to publish its tentative FIP in the Federal Register by April 30, 1990 and to set forth its final implementation plan in the Federal Register by February 28, 1991. The suit was stayed till March 31, 1991. The parties reserved the right to argue to the court the effect of any legislation that might be passed by Congress during the stay.
 
 
 46
 The Coalition had the right under the Settlement to move the court to vacate the stay if EPA did not keep the agreed deadlines. EPA did not observe the deadlines. The district court extended the date for the tentative FIP to July 31, 1990. EPA actually filed it in September 1990. The final FIP was never published.
 
 
 47
 In November 1990 Congress enacted the Clean Air Act Amendments of 1990 ("the 1990 Amendments"). The stay was never vacated, and it continued to be in effect when on November 30, 1990 EPA brought this action to vacate the settlement and dismiss the Coalition's complaint
 
 
 48
 The Repeal of Section 7410(c) of the 1970 Amendments.
 
 
 49
 The following language of the 1970 Amendments was deleted by the 1990 Amendments:
 
 
 50
 (1) The Administrator shall, after consideration of any state hearing record, promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if--
 
 
 51
 (A) the State fails to submit an implementation plan which meets the requirements of this section,
 
 
 52
 (B) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section, or
 
 
 53
 (C) the State fails, within 60 days after notification by the Administrator or such longer period as he may prescribe, to revise an implementation plan as required pursuant to a provision of its plan referred to in subsection (a)(2)(H) of this section.
 
 
 54
 If such State held no public hearing associated with respect to such plan (or revision thereof), the Administrator shall provide opportunity for such hearing within such State on any proposed regulation. The Administrator shall, within six months after the date required for submission of such plan (or revision thereof), promulgate any such regulations unless, prior to such promulgation, such State has adopted and submitted a plan (or revision) which the Administrator determines to be in accordance with the requirements of this section. Notwithstanding the preceding sentence, any portion of a plan relating to any measure described in the first sentence of section 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title shall not be required to be promulgated before the date eight months after such date required for submission.
 
 
 55
 It was this language that imposed a categorical obligation on EPA to issue a FIP if a state defaulted on its obligation to provide a suitable SIP. It was this language on which the Coalition had relied in the suit that resulted in the Settlement. With the excision of this language by Congress the foundation of the Settlement disappeared.
 
 
 56
 New Section 7410(c) of the 1990 Amendments.
 
 
 57
 Congress in 1990 rewrote Section 7410(c) as follows:
 
 
 58
 (1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator--
 
 
 59
 (A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under section 7410(k)(1)(A).
 
 
 60
 The 1990 Amendments imposed an obligation on EPA to issue a FIP within 2 years of a state's default, rather than the obligation to do so "promptly" or within six to eight months as the 1970 Amendments required. The 1990 Amendments triggered this obligation by reference to an entirely new part of the law, § 7410(k). The provision required EPA to set "minimum criteria" for any state plan and to do so "within 9 months after November 15, 1990," the date of enactment of the Clean Air Act Amendments of 1990.
 
 
 61
 Alternatively, the EPA acquired the obligation to issue a FIP "within 2 years after the Administrator ... (B) disapproves a State implementation plan in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or revision, before the Administrator promulgates such Federal implementation plan." Section 7410(c)(1)(B).
 
 
 62
 It is this language that the Coalition now relies on. It is the language that the Coalition maintains imposes the same obligation on EPA that existed under the 1970 Amendments. It is this language that the Coalition argues is to be understood as applicable not only to future but to past disapprovals of State plans by EPA.
 
 
 63
 Comparison of the new language with the old dispels the Coalition's contention. First, it is doubtful that a verb in the present tense, "disapproves," can be read as a verb in the past tense, "has disapproved." Gwaltney indicates that it should not be so read. Gwaltney & Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 59, 108 S.Ct. 376, 382, 98 L.Ed.2d 306 (1987). Second, the old language provided that the EPA should "promptly" move to publish a FIP once the Administrator had determined that the State plan was not "in accordance with the requirements of this section." The new language gives EPA two years within which it should issue a FIP. Third, the old language gave the State 60 days or a longer period prescribed by EPA to correct a provision of the plan relating to air quality control. The new language permits the State to correct any deficiency without any time limit being prescribed short of the two years set by the statute for EPA's action. The old statute has been repealed. The new statute is certainly comparable, but its language is future-looking and its commands different from the old.
 
 
 64
 This conclusion comes from inspection of (B), the fragment of the new law on which the Coalition relies. The conclusion is reinforced if the new law is inspected more broadly. To begin with, the Coalition argues as though new (A) were not on the books. There is no reason to ignore (A). It gives a cross-reference to another new and important part of the 1990 Amendments, Section 7410(k)(1)(A). As enacted by Congress, this section begins, "Within 9 months after the date of the enactment of the Clean Air Act Amendments of 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this section." Pub.L. 101-549, § 101(c)(k)(1)(A), 104 Stat. 2399, 2406 (1990). (When this section was codified, the reference to the date of enactment was replaced with the actual date, November 15, 1990. See 42 U.S.C.A. § 7410(k)(1)(A) (West Supp.1992).) Beyond dispute, EPA's obligations here are set in terms of the date of enactment of the 1990 Amendments. To suppose that its obligations under (B) are not is to do violence to the sense of the statute.
 
 
 65
 Section 7410(k), to which A makes cross-reference, goes on to lay out an elaborate timetable for EPA action in regard to State plans that do or do not meet the minimum criteria. The Coalition's narrow focus on B reads this timetable out of the law. On the Coalition's reading, none of Section 7410(k) has any relevance because EPA disapproved California's SIP in 1988. The Coalition's reading makes otiose as regards a major area of the country the careful prescriptions of the 1990 Amendments. By every canon of construction A and B should be read harmoniously and as a whole.
 
 
 66
 The Coalition argues that "Section 110c [Section 7410(d) ] was not new." Read as simply B of the new Section 7410(c), it was new. Read again as both A and B of the new Section 7410(c), it was new. The contention that it was not disregards the text of the statute.
 
 
 67
 Other Relevant Changes Made by the 1990 Amendments.
 
 
 68
 The 1977 Amendments to the Clean Air Act required a State to attain the required air quality standards by December 31, 1987. 42 U.S.C. § 7502(a)(2) (as of 1977). It was California's failure to provide for this attainment that led EPA to disapprove the State's SIP. The date set by the 1977 Amendments was eradicated by the 1990 Amendments. The South Coast must now demonstrate attainment with the carbon monoxide standard by 2000 and with the ozone standard by 2010, 42 U.S.C. §§ 7511(a)(1), 7512(a)(1). The new statute removes the basis for the Settlement. The Coalition in its Opening and Reply Briefs fails to address this substantial change in the law.
 
 
 69
 The 1990 Amendments also provide a detailed timetable in accordance with which California must move to the attainment of the goals to be achieved by 2000 and 2010. This timetable is set in explicit reference to the date of the enactment of the 1990 Amendments, see, e.g., 42 U.S.C. § 7511a(c), (d) and (e). It makes nonsense of the provisions of this timetable to superimpose upon them the Settlement which depends on the 1970 and 1977 Amendments.
 
 
 70
 For the first time the new law permits EPA to approve, in a statutorily defined Extreme Area (such is the South Coast for ozone), provisions of a SIP which "anticipate development of new control techniques," provided that "such provisions are not necessary to achieve the incremental emission reductions required during the first 10 years after the date of the enactment of the Clean Air Act Amendments of 1990." Pub.L. 101-549, § 103, 104 Stat. 2399, 2439 (1990). (Once more the actual date of enactment was inserted in the Code version. See 42 U.S.C.A. § 7511a(e)(5) (West Supp.1992).) Again, the timing is set in terms of the 1990 Amendments. Again, something different has been added. EPA had disapproved California's SIPs in terms of the old law that left no such possibility for technological breakthroughs. It would again make nonsense of the new law to hold that the old disapproval must continue in effect despite the relaxation of the standards effected by the 1990 changes.
 
 
 71
 The Clean Air Act of 1960 proclaimed that "the prevention and control of air pollution at its source is the primary responsibility of state and local governments." 42 U.S.C. § 7401(a)(3) (before 1990 amendments). The Act stated one of its purposes was "to provide technical and financial assistance to state and local governments in connection with the development and execution of their air pollution prevention and control programs." 42 U.S.C. § 7401(b)(3) (unamended). The 1990 Amendments left (b)(3) unchanged. The 1990 Amendments amended (a)(3) to declare "that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of state and local governments." 42 U.S.C. § 7401(a)(3) (1990). In the face of this ringing assertion of state primacy, the Coalition's argument for federal action stands the legislation on its head.
 
 
 72
 The Clean Air Act in its original form and as amended in 1990 specifies that the State has primary responsibility for satisfying pollution requirements and requires it to develop a plan in the first instance. That applies to the new requirements enacted in 1990. California must have an opportunity to address these requirements before EPA steps into the breach.
 
 
 73
 The Savings Clause.
 
 
 74
 The Coalition's fallback position, not reached by the majority opinion, is that the 1990 Amendments contain what is styled "General Savings Clause." This part of the statute reads as follows:
 
 General savings clause
 
 75
 Each regulation, standard, rule, notice, order and guidance promulgated or issued by the Administrator under this chapter, as in effect before November 15, 1990 shall remain in effect according to its terms, except to the extent otherwise provided under this chapter, inconsistent with any provision of this chapter, or revised by the Administrator. No control requirement in effect, or required to be adopted by an order, settlement agreement, or plan in effect before November 15, 1990 in any area which is a nonattainment area for any air pollutant may be modified after November 15, 1990 in any manner unless the modification insures equivalent or greater emission reductions of such air pollutant.
 
 
 76
 42 U.S.C. § 7515.
 
 
 77
 The only possibly relevant language is the single sentence that speaks of a "control requirement" "required to be adopted by an order, settlement agreement or plan in effect before November 15, 1990...." But even this language does not help the Coalition. A "control requirement" is a term of art. A control requirement is "a discrete regulation directed at a source of pollution." 56 Fed.Reg. 826, 828 (January 9, 1991). In the same way, the 1990 Amendments under the caption "Control requirements" speak of the regulations imposed on "a unit," e.g., a fossil fuel-fired combustion device, 42 U.S.C. § 7651h(d) and § 7651a(15).
 
 
 78
 A control requirement is not a FIP. The Settlement Agreement required EPA to promulgate a FIP. The Settlement Agreement did not require the adoption of any particular control requirement. The General Savings Clause, therefore, does not save the Settlement Agreement.
 
 
 79
 To the contrary, the regular rule expressio unius, exclusio alterius applies. Congress enumerated what it wanted to survive the repeals effected by the 1990 Amendments. As the majority opinion correctly notes, Congress did not repeal the basis for existing FIPs. The 1990 Amendments specifically preserved every regulation in effect before the date of the amendments. The Settlement Agreement that merely required a FIP was not a regulation and it was not a control agreement. It was not spared.
 
 
 80
 Expressio unius, exclusio alterius--this standard method of interpreting a statute was first invoked here by the Coalition. But its application defeats the Coalition's reading of the 1990 Amendments. Saving regulations and control requirements, Congress deliberately and decisively omitted the kind of settlement the Coalition relies on.
 
 
 81
 Conclusion.
 
 
 82
 There is no one, I suppose, who does not desire a cleaner, brighter, healthier South Coast. Attainment of the goal, however, is not without substantial costs. The conflict that the costs have caused is reflected in the actions of EPA and in the congressional legislation. The Coalition makes much of the delay in achieving acceptable standards for ozone and carbon monoxide. It accuses EPA of "footdragging" and even of "entrenched footdragging," a difficult accomplishment. But even if the courts could supply what the Coalition sees as the missing will in the agency, the courts cannot supply a will that is not present in the legislation. In a major economic and political battle Congress has chosen the path of slow progress. It is not the task of judges to produce a different rate of attainment. The district court properly dismissed the Coalition's suit.
 
 
 83
 On the assumption that the majority opinion remains the law, I concur in the judgment as to attorney's fees.
 
 
 
 *
 The panel unanimously finds Case No. 91-55634 suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 [1]
 The South Coast Air Basin covers much of Southern California including Orange County and the non-desert portions of Los Angeles, Riverside, and San Bernadino Counties. It has by far the worst ozone and nitrogen dioxide levels in the United States and arguably the worst carbon monoxide level of any urbanized area in the United States. 55 Fed.Reg. 36,458, 36,464 (1990)
 
 
 [2]
 The other four pollutants were particulate matter, sulfur dioxide, nitrogen oxides, and hydrocarbons. Lead was added to the list in 1978 and hydrocarbons were removed in 1983. See Abramowitz, 832 F.2d at 1073
 
 
 [3]
 In a separate action, EPA moved to vacate a settlement agreement requiring it to promulgate a FIP for the Sacramento area. The district court denied EPA's motion on December 2, 1991. Environmental Council of Sacramento v. EPA, Civ. No. S-87-420 EJG, (E.D.Cal. Dec. 2, 1991)
 
 
 [4]
 Under the terms of the pre-1990 Act, EPA had only six months from the date that the original state submission was due in which to promulgate a FIP. 84 Stat. at 1681-82
 
 
 [5]
 Thus, we agree with Judge Noonan that the language of § 110(c)(1) is "future-looking." Dissent at 232. We disagree, however, that § 110(c)(1) looks to the future from the time of the 1990 Amendments' enactment as opposed to the time of the triggering events listed in § 110(c)(1)
 
 
 [6]
 Nor, in our view, is it significant that Congress chose to increase the time EPA is given to prepare a FIP to two years and to permit states to correct deficiencies in their SIPs at any time within those two years. See Dissent at 231. Both these changes affect what happens after EPA's duty to promulgate a FIP has been triggered. Neither one bears on when EPA's duty is triggered, which is the critical question in this case
 
 
 [7]
 Prior to 1990, § 110(c)(1) contained three triggering events, all of which have been incorporated in the new § 110(c)(1). Old subsection (A) dealt with a State's failure to submit a SIP. Old subsection (C) dealt with a State's failure to revise a SIP. Both situations are now incorporated in subsection (A) which refers broadly to "required submission[s]." Old subsection (B), which required promulgation of a FIP when a SIP was determined not to meet the requirements of the Act, is incorporated in current subsection (B), which requires promulgation of a FIP when EPA disapproves a SIP
 
 
 [8]
 Judge Noonan asserts that Congress removed the basis for appellants' claim when it extended the deadlines for attainment, but this argument proves too much. See Dissent at 232. By the same logic, Congress would at the same time have removed the basis for all existing FIPs that rest on a state's past failure to meet a deadline. We are aware of nothing in the 1990 Amendments or their legislative history indicating that Congress intended to invalidate all existing FIPs. Indeed EPA agreed at oral argument that, if the South Coast FIPs had been in effect at the time of the 1990 Amendment, those amendments would not have provided the basis for vacating the existing FIPs
 
 
 [9]
 Judge Noonan cites Congress' finding in § 101 of the Act that prevention and control of air pollution is "the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3); Dissent at 232. But Congress also found "that Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local government programs to prevent and control air pollution." 42 U.S.C. § 7401(a)(4). Moreover, Congress' decision to require mandatory FIPs if the states failed to provide for attainment of NAAQS shows that Congress did not intend to leave air pollution control to the states alone. Contrary to Judge Noonan's assertion, it does not stand the Clean Air Act on its head to enforce a mandatory obligation imposed by Congress. See Dissent at 232
 
 
 [10]
 Moreover, a FIP, as defined by the 1990 Amendments, is specifically designed to supplement rather than to replace state planning: "a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan." 42 U.S.C. § 7602(y) (emphasis added)
 
 
 [11]
 Under § 7511a(e), the state is required to submit revisions to the "applicable implementation plan." The Act defines "applicable implementation plan" as "the portion (or portions) of the implementation plan or most recent revision thereof, which has been approved under section 7410, or promulgated under section 7410(c)." 42 U.S.C. § 7602(q). In other words, it refers both to SIPs approved by EPA and to FIPs promulgated by EPA
 
 
 [12]
 EPA has taken no position on the question whether appellants are entitled to fees against Edison