UNITED STATES of America, People of the State of California, ex rel. California Department of Fish and Wildlife, et al., Plaintiffs,

v.

HVI CAT CANYON, INC., f/k/a Greka Oil & Gas, Inc., Defendant.

Case No. CV 11–5097 FMO (SSx)

United States District Court, C.D. California.

Signed 09/30/2016

**1252**

Angela Mo, Mark Sabath, US Department of Justice, Environmental Enforcement Section, Washington, DC, Davis H. Forsythe, United States Department of Justice, Denver, CO, Robert D. Mullaney, United States Department of Justice, San Francisco, CA, Michael T. Zarro, Ross H. Hirsch, Gary E. Tavetian, Shanaira F. Udwadia, CAAG—Attorney General Office of California, Los Angeles, CA, for Plaintiffs.

James L. Meeder, Kamran Javandel, Allen Matkins Leck Gamble Mallory & Natsis LLP, San Francisco, CA, Robert C. O'Brien, Stephen Gerard Larson, Larson O'Brien LLP, Emily L. Murray, Allen Matkins Leck Gamble Mallory & Natsis LLP, Steven E. Bledsoe, Arent Fox LLP, Los Angeles, CA, for Defendant.

## ORDER Re: PENDING MOTION

Fernando M. Olguin, United States District Judge

Having reviewed and considered all the briefing filed with respect to defendant's Motion for Partial Summary Judgment ("Motion") (Dkt. 92), the court concludes that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78; Local Rule 7–15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## BACKGROUND

This case arises out of a series of oil spills that occurred between 2005 and 2010. On June 17, 2011, plaintiffs United States of America (the "Government"), and the People of the State of California ("State"), ex rel. California Department of Fish and Wildlife ("CDFW") and the California Regional Water Quality Control Board, Central Coast Region ("Regional Board" and together with the Government and CDFW, "plaintiffs"), filed a Complaint against HVI Cat Canyon, Inc., f/k/a Greka Oil & Gas, Inc. ("defendant" or "HVI") asserting claims for: (1) violations of § 311 of the Clean Water Act (the "CWA"), 33 U.S.C. § 1321(b); (2) violations of § 301 of the CWA, 33 U.S.C. § 1311(a); (3) failure to prepare and implement and/or maintain Spill Prevention, Control, and Countermeasure Plans as required by 40 C.F.R. Part 112; (4) failure to prepare and submit facility response plans in accordance with 40 C.F.R. § 112.20; (5) recovery of removal costs under § 1002(a) of the Oil Pollution Act of 1990, 33 U.S.C. § 2702(a); (6) violations of California Water Code § 13350; (7) violations of California Water Code § 13385; (8) violations of California Fish and Game Code § 5650; (9) recovery of natural resource damages pursuant to California Fish and Game Code § 12016; and (10) recovery of costs pursuant to California Fish and Game Code § 13013(c). (See Dkt. 1, Complaint at ¶¶.180–215).

Defendant moved to dismiss the First, Sixth, Seventh, Eighth, Ninth and Tenth claims on September 9, 2011. (See Dkt. 6, Motion to Dismiss [ ] Claims for Relief in Plaintiffs' Complaint at 1). The court (Judge Pregerson presiding) denied the motion to dismiss on June 8, 2012. (See Dkt. 26, Court's Order of June 8, 2012, at 7). On June 27, 2012, defendant filed a Motion for Reconsideration and a Motion for Certification of Interlocutory Appeal.[1] (See Dkt. 29, Defendant's Motion for Reconsideration at 1; Dkt. 30; Defendant's Motion for Certification of Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b)). On January 16, 2013, the court (Judge Pregerson presiding) denied the motions (see Dkt. 50, Court's Order of January 16, 2013) and issued an Amended Order Denying Defendant's Motion to Dismiss. (See Dkt. 51, Court's Order of January 16, 2013). On February 28, 2013, plaintiffs filed their First Amended Complaint ("FAC"), the operative complaint, asserting the same claims. (See Dkt. 56, FAC).

Defendant filed the instant Motion on November 6, 2014. (See Dkt. 92, Motion at 1). The parties filed their respective supplemental briefs on November 20, 2014. (See Dkt. 111, Plaintiffs' Supplemental Memorandum [ ] in Opposition to Defendant's Motion [ ] ("Plaintiffs' Suppl."); Dkt. 115, Defendant's Supplemental Memorandum [ ] in Support of Motion [ ] ("Defendant's Suppl.")). Defendant also filed a Motion for Terminating Sanctions on November 6, 2014. (See Dkt. 98, Motion for Terminating Sanctions or, in the Alternative, Other Appropriate Sanctions ("Motion for Terminating Sanctions")). The court stayed the proceedings pending a decision on defendant's Motion for Terminating Sanctions, (see Dkt. 122, Court's Order of December 17, 2014), and referred the motion to the then-assigned Magistrate Judge for a decision. (See Dkt. 123, Court's Order of December 18, 2014).

---

1. The motion sought to certify the following question for appeal: "Is Section 311(b)(3) of the Clean Water Act, 33 U.S.C. § 1321(b)(3), limited, by the term 'navigable waters of the United States,' to oil discharges into or upon interstate waters that are 'navigable in fact' or readily susceptible to being rendered so, and the adjoining shorelines of such waters?" (See Dkt. 30, Motion for Reconsideration at 1).

In the Motion for Terminating Sanctions, defendant claimed that the CDFW had failed to issue a litigation hold which resulted in the destruction of relevant documents, emails, other electronically stored information, and the spoliation of evidence. (See Dkt. 98, Motion for Terminating Sanctions at 1). On April 1, 2015, the Magistrate Judge issued a Report and Recommendation ("R & R"), recommending in relevant part that witnesses Kelly Abe ("Abe"), Melissa Boggs ("Boggs"), Dave Brown ("Brown"), Dennis Chastain ("Chastain"), Mike Connell ("Connell"), Robin Lewis ("Lewis"), Becky Mack ("Mack"), Bill Scott ("Scott"), Beckye Stanton, and Charles Robert Todd ("Todd") be excluded from testifying at trial. (See Dkt. 134, R & R at 13, 16). The court accepted the findings and conclusions of the Magistrate Judge with modifications. (See Dkt. 150, Court's Order of November 20, 2015). Specifically, the court found that only Brown, Lewis, Scott, and Todd should be excluded from testifying at trial on behalf of the State. (Id. at 4). However, the court did not exclude any witnesses from testifying on behalf of the Government. (Id.). The court also ordered the State to pay the reasonable costs and attorney's fees for the taking of specified depositions. (Id.).

The court lifted the stay of proceedings on November 23, 2015. (See Dkt. 152, Court's Order of November 23, 2015, at 2, 8). On December 28, 2015, the parties filed a stipulation and request to stay the proceedings for approximately 30 days due to defendant's financial distress caused by the steep drop in the price of crude oil. (See Dkt. 157, Stipulation of All Parties and Joint Request for Entry of Case Management Order No. 10 at 1, 3). The court approved the stipulation and stayed the action through January 29, 2016. (See Dkt. 158, Case Management Order No. 10 at 2). The court thereafter stayed the action through June 15, 2016. (See Dkt. 164, Case Management Order No. 11 at 2; Dkt. 166, Case Management Order No. 12 at 1; Dkt. 168, Case Management Order No. 13 at 2; Dkt. 173, Court's Order of June 15, 2016, at 7).

## PLAINTIFFS' ALLEGATIONS [2]

Defendant owned and/or operated 12 oil and gas production facilities and the Bradley Three–Island Facility ("Bradley 3–Island") in Santa Maria, California.[3] (See Dkt. 56, FAC at ¶¶ 57–58). These oil and gas production facilities inject heated water into the ground to extract crude oil from oil reservoirs. (Id. at ¶ 59). Defendant pumps fluids from the ground consisting of a combination of crude oil and produced water.[4] (Id.). The crude oil is then separated from the produced water in tanks, sumps, separators, and ponds. (Id.). Produced water is produced to the surface along with crude oil. (Id. at ¶ 60).

On June 8, 2007, a six-inch water pipe ruptured at defendant's Bradley 3–Island Facility resulting in a spill of crude oil and produced water into a creek bed. (See Dkt. 56, FAC at ¶ 140). There were also numerous spills at defendant's Bell Facility in

---

2. In citations to the record, capitalization, emphasis, internal alteration marks, and internal quotation marks may be altered or omitted without notation.

3. Defendant continues to own and/or operate all the oil and gas production facilities with the exception of the U–Cal facility. (See Dkt. 56, FAC at ¶¶ 57–58).

4. Produced water typically contains water, crude oil, grease, dissolved salts, organic compounds and inorganic compounds, and is either present in a reservoir with crude oil or injected into the reservoir to aid in the extraction of crude oil. (Dkt. 56, FAC at ¶ 60).

Santa Maria, California.[5] Specifically, on July 16, 2007, a flowline ruptured and spilled crude oil and produced water in harmful quantities into an unnamed tributary to Sisquoc Creek running along Palmer Road ("Palmer Road Creek")[6] and its adjoining shorelines. (See id. at ¶ 91–93). On December 7, 2007, an injection pond at defendant's Bell Facility overflowed and spilled crude oil and produced water, which reached Palmer Road Creek and its adjoining shorelines in harmful quantities. (See id. at ¶¶ 94–96).

On January 29, 2008, another spill occurred after a corroded pipe at a settling pond at the Bell Facility failed, resulting in harmful quantities of crude oil and produced water reaching Palmer Road Creek and Sisquoc Creek and their adjoining shorelines. (See Dkt. 56, FAC at ¶¶ 97–99). On April 15, 2008, the Environmental Protection Agency ("EPA") found that crude oil and produced water were leaking from a surface impoundment at the Bell Facility located approximately 100 feet from Sisquoc Creek. (See id. at ¶¶ 100–101). On July 2, 2009, a leaking injection line at the Bell Facility resulted in the release of crude oil and produced water into an unnamed creek. (See id. at ¶ 143).

Plaintiffs also claim that crude oil and produced water were spilled from the Bell Facility on June 8, 2005, July 13, 2005, August 11, 2005, December 27, 2008, May 1, 2009, October 14, 2010, and December 21, 2010. (See Dkt. 56, FAC at ¶ 104).

According to plaintiffs, the spills on June 8, 2005, July 13, 2005, October 14, 2010, and December 21, 2010, reached Palmer Road Creek and its adjoining shorelines in harmful quantities. (See id. at ¶¶ 105–106).

Plaintiffs also allege that a crude oil and/or produced water spill on August 11, 2005, reached Cat Canyon Creek and its adjoining shorelines in harmful quantities. (See Dkt. 56, FAC at ¶¶ 107–108). Finally, plaintiffs claim that the two spills on December 27, 2008, and May 1, 2009, resulted in harmful quantities of crude oil and/or produced water reaching an unnamed creek plaintiffs refer to as "Spring Canyon Tributary"[7] and its adjoining shorelines. (See id. at ¶¶ 109–110).

Plaintiffs allege that Palmer Road Creek, Sisquoc Creek, Spring Canyon Tributary, Spring Canyon Creek, Cat Canyon Creek, the Sisquoc River, the Santa Maria River, and the Santa Maria River Estuary are all "navigable waters" within the meaning of the CWA and therefore the various spills from the Bell Facility constitute "discharges of oil into or upon the navigable waters of the United States or adjoining shorelines within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3." (See Dkt. 56, FAC at ¶ 123). Plaintiffs also assert that the spills "were all releases to waters of the state within the meaning of California Water Code section 13050(e)." (Id. at ¶ 138).

---

**5.** The FAC alleges various other spills, a removal action, and violations of oil pollution prevention regulations not subject to the instant Motion. (See, e.g., Dkt. 56, FAC at ¶¶ 65–90, 139–186).

**6.** The court will refer to this tributary as "Palmer Road Creek." According to the FAC, Palmer Road Creek is a tributary of Sisquoc Creek which in turn is a tributary of Cat Canyon Creek. (See Dkt. 56, FAC at ¶ 120). Cat Canyon Creek is a tributary to the Sisquoc River which is a tributary to the Santa Maria River. (See id.). Plaintiffs claim that the Santa Maria River is a tributary to the Santa Maria River Estuary, "a traditionally navigable water that flows into the Pacific Ocean." (See id.).

**7.** Plaintiffs claim that Spring Canyon Tributary is a tributary of Spring Canyon Creek which itself is a tributary to Cat Canyon Creek. (See Dkt. 56, FAC at ¶ 121).

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.

The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party fails to carry its initial burden of production, "the non-moving party has no obligation to produce anything." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000).

If the moving party has sustained its burden, the burden then shifts to the non-movant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[8] A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). Summary judgment must be granted for the moving party if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party. See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992). However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for

---

**8.** "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56–3.

the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

## DISCUSSION

### I. OBJECTIONS TO EVIDENCE.

The parties raised numerous boilerplate evidentiary objections in connection with the instant Motion. (See Dkt. 92–1, Motion at 16–17; see generally, Dkt. 92–3, Joint Statement of Uncontroverted Facts Re: HVI Cat Canyon, Inc.'s Motion for Partial Summary Judgment ("SUF")). Defendant objects to the declarations and supporting exhibits submitted by J. Andrew Helmlinger,[9] Matthew Mitchell and Randy Schulley ("Schulley"), arguing that they "are irrelevant, argumentative, mischaracterize the document, speculative, lack foundation, are not within the witnesses's personal knowledge, constitute improper legal opinion, are improper opinion testimony, and hearsay not made under oath offered for the truth of the matter asserted." (See Dkt. 92–1, Motion at 16). Defendant also objects to the declarations and exhibits submitted by CDFW witnesses Boggs, Edward K. Boyes ("Boyes"), Chastain, Connell, and Nathaniel Jamie Dostal ("Dostal") on the same grounds and also because their testimony is precluded by spoliation of evidence. (See id. at 16–17). With respect to the Regional Board, defendant similarly objects to the declarations and exhibits of CDFW witnesses Connell, Josh Curtis, Dostal, and Jorge Gross. (See id. at 54). Finally, plaintiffs object to defendant's supporting declarations and reports on hearsay grounds. (See Dkt. 92–1, Motion at 17; Dkt. 92–3, SUF at D15–16, D18–19, D21–22, D24–25, D26–27, D30–31, D33–34, D36–37, D39–40). However, plaintiffs acknowledge that their objections are responses in kind to defendant's objections,

stating they "are willing to stipulate that these County and State reports qualify as exceptions to the rule against hearsay pursuant to Fed. R. Evid. 803(6) or (8)[.]" (Id. at 17).

The parties' evidentiary objections are boilerplate and devoid of any specific argument or analysis as to why any particular exhibit or assertion in a declaration should be excluded. (See, generally, Dkt. 92–1, Motion at 16–17 & 54). As such, the court overrules the parties' objections. See Amaretto Ranch Breedables v. Ozimals, Inc., 907 F.Supp.2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development, and the Court accordingly summarily overrules the objections.") (internal citations omitted); Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F.Supp.2d 1023, 1033 (C.D. Cal. 2013) (declining to "scrutinize each objection and give a full analysis of identical objections" due to the parties' boilerplate evidentiary objections on summary judgment); Capitol Records, LLC v. BlueBeat, Inc., 765 F.Supp.2d 1198, 1200 n. 1 (C.D. Cal. 2010) (noting that it was impractical for the court to closely analyze every objection when many of the objections were boilerplate and devoid of any specific analysis).

However, even assuming the parties had raised proper evidentiary objections, the court is not persuaded that any evidence relied upon by the court in ruling on the instant Motion. should be excluded. For example, it appears that many of the challenged reports, (see, e.g., Dkt. 92–3, SUF at P1, P6, P12–P19, P23–P26, P29–P33, P35–P48, P50–P55, P57, P60–P67), are admissible under the public records excep-

___

9. Plaintiffs do not rely on any declarations or exhibits from Helmlinger as supporting evidence. (See, generally, Dkt. 92–3, SUF).

tion. See Fed. R. Evid. 803(8)(A)(iii) & (B) (A "record or statement of a public office" is admissible if, in pertinent part, "it sets out . . . in a civil case . . . factual findings from a legally authorized investigation; and . . . the opponent does not show that the source of information or circumstances indicate a lack of trustworthiness."); San Francisco Baykeeper v. West Bay Sanitary Dist., 791 F.Supp.2d 719, 743 (N.D. Cal. 2011) (The public records exception "is designed to allow admission of official records and reports prepared by an agency or government office for purposes independent of specific litigation.") (internal quotation marks omitted).

■ Defendant objects that a declaration from Dostal is hearsay and should be excluded because of witness destruction of evidence. (See Dkt. 92–3, SUF at P29–P31). In his declaration, Dostal, a Warden with the CDFW, states that in his position as a Warden, he was primarily responsible for preparing various investigation reports regarding spills at the Bell Facility. (See Dkt. 93, Joint Evidentiary Appendix ("Appendix"), Exh. 24 (Dkt. 93–1, Declaration of Nathaniel Jamie Dostal in Support of Plaintiffs' Opposition to Motion for Partial Summary Judgment ("Dostal Decl.") at ¶¶ 1–2)). This is sufficient to establish his personal knowledge of the various matters discussed in his declaration. See Sea–Land Service, Inc. v. Lozen Intern., LLC, 285 F.3d 808, 819 (9th Cir. 2002) (declaration explaining the declarant's duty at her position and familiarity with bills of lading sufficient to establish her personal knowledge and foundation).

Dostal also states that the various investigation reports attached to his declaration were made pursuant to a legally authorized investigation of the spills. (See Dkt. 93–1, Appendix, Exh. 24, Dostal Decl. at ¶ 2). The CDFW is charged with administering and enforcing the California Fish and Game Code. See Cal. Fish and Game Code § 702. Under California Fish and Game Code § 5650(a), the placing of any petroleum or residuary product of petroleum "into the waters of this state" is prohibited. The CDFW has the authority to "cause to be cleaned up or abated, the effects of any petroleum or petroleum product deposited or discharged in the waters of this state or deposited or discharged in any location onshore or offshore where the petroleum or petroleum product is likely to enter the waters of this state[.]" Id. at § 5655(a). Under the circumstances, the court finds that the reports attached to Dostal's declaration were made as part of an investigation the CDFW was legally authorized to conduct. See 4 Mueller & Kirkpatrick, Federal Evidence § 8:84 (4th ed. 2016) ("[A]n agency is 'legally authorized' to investigate a matter if its responsibilities include regulating or overseeing the area in question, even if the statute does not say that the agency is to investigate and make periodic reports.").

■ "[T]he Federal Rules of Evidence specifically permit the introduction of public records setting forth 'factual findings from a legally authorized investigation' unless the opposing party demonstrates 'that the source of information or other circumstances indicate a lack of trustworthiness.'" Tesoro Refining & Mktg. Co. LLC v. Pac. Gas and Elec. Co., 2016 WL 158874, *20 (N.D. Cal. 2016) (quoting Fed. R. Evid. 803(8)); see U.S. v. Nat'l Wood Preservers, Inc., 1986 WL 12761, *7 (E.D. Pa. 1986) (concluding that EPA pollution reports indicating the presence of "black oil pools" and sheen were admissible under Fed. R. Evid. 803(8)) (internal quotation marks omitted). "A party opposing the introduction of a public record bears the burden of coming forward with enough negative factors to persuade a

court that a report should not be admitted. This rule is premised on the assumption that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports." Johnson v. City of Pleasanton, 982 F.2d 350, 352–53 (9th Cir. 1992). Here, defendant's boilerplate objections are insufficient to meet defendant's burden to persuade the court that the reports attached to Dostal's declaration should not be admitted. See id.; Montiel v. City of Los Angeles, 2 F.3d 335, 341 (9th Cir. 1993) (public records are presumed trustworthy and the opponent of the evidence has the burden of showing untrustworthiness).

■ Similarly, the court finds that defendant has not met its burden to show that the declaration and attached reports to Boggs's declaration, (see Dkt. 93, Appendix, Exh. 20, Declaration of Melissa Boggs in Support of Plaintiffs' Opposition to Motion for Partial Summary Judgment ("Boggs Decl.")), should not be admitted.[10] In her declaration, Boggs states that she is a Senior Environmental Scientist (Supervisor) with the CDFW and prepared the reports for one of the spills at issue (the July 13, 2005, Palmer Road Creek spill) as part of her responsibilities and as part of a legally authorized investigation. (See id. at ¶¶ 1–2); see also Cal. Fish and Game Code § 5655. She personally visited the spill site and observed the cleanup operations. (See Dkt. 93, Boggs Decl. at ¶¶ 3–7). Thus, her report falls under the public records exception. See Fed. R. Evid. 803(8).

■ Further, "[a]t the summary judgment stage, courts focus on admissibility of the evidence's content, not its form." Clark v. Cty. of Tulare, 755 F.Supp.2d 1075, 1083 (E.D. Cal. 2010); Burch v. Regents of Univ. of Cal., 433 F.Supp.2d 1110, 1120 (E.D. Cal. 2006) ("Summary judgment is not a game of 'Gotcha!' in which missteps by the non-movant's counsel, rather the merits of the case, can dictate the outcome."). A non-moving party "does not necessarily have to produce evidence in a form that would be admissible at trial[.]" Block v. City of Los Angeles, 253 F.3d 410, 418–19 (9th Cir. 2001). "It would be sufficient if the contents of the [records] are admissible at trial, even if the [records themselves] may be inadmissible." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003), cert. denied, 541 U.S. 937, 124 S.Ct. 1663, 158 L.Ed.2d 358 (2004) (holding that the court "do[es] not focus on the admissibility of the evidence's form" but rather "focus[es] on the admissibility of its contents"). Here, to the extent that any of the records attached to the declarations in dispute do not qualify under the public records exception, any deficiencies concerning the records could be cured at trial by having the relevant individual testify as to their contents. See AtPac, Inc. v. Aptitude Sols., Inc., 787 F.Supp.2d 1108, 1111 (E.D. Cal. 2011) ("Even if the non-moving party's evidence is presented in a form that is currently inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the moving party's objections could be cured at trial."); see, e.g. Fraser, 342 F.3d at 1037 (explaining

---

10. Defendant also failed to meet its burden with respect to the declarations and exhibits from Boyes, Chastain, Connell, and McNulty. (See, generally, Dkt. 93–1, Appendix, Exh. 25, Declaration of Edward K. Boyes in Support of Plaintiffs' Opposition to Motion for Partial Summary Judgment; Dkt. 93–1, Appendix, Exh. 26, Declaration of Dennis Chastain in Support of Plaintiffs' Opposition to Motion for Partial Summary Judgment; Dkt. 93, Appendix, Exh. 21, Declaration of Michael Connell in Support of Plaintiff's Opposition to Motion for Partial Summary Judgment; Dkt. 93, Appendix, Exh. 23, Declaration of Pam McNulty in Support of Plaintiffs' Opposition to Motion for Partial Summary Judgment). Thus, those declarations and exhibits are also admissible.

that the contexts of a diary could be admitted into evidence at trial "in a variety of ways" including having the diary's writer "testify to all the relevant portions of the diary from her personal knowledge" or by using the diary to refresh her recollection).

Finally, defendant's argument based on spoliation of evidence is irrelevant because plaintiffs do not rely on any declarations from Brown, Lewis, Scott, and Todd. (See, generally, 92–1, Motion; Dkt. 92–3, SUF; see also Dkt. 150, Court's Order of November 20, 2015, at 4). Moreover, the court only excluded Brown, Lewis, Scott, and Todd "from testifying at trial on behalf of California" and, in any event, the exclusion does not apply to the Government. (See Dkt. 150, Court's Order of November 20, 2015, at 4). In short, for the reasons set forth above, the parties' evidentiary objections are overruled.[11]

## II. THE CLEAN WATER ACT.

 "In 1972 Congress passed the [CWA] to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Our Children's Earth Found. v. U.S. E.P.A., 527 F.3d 842, 844 (9th Cir.), cert. denied, 555 U.S. 1045, 129 S.Ct. 627, 172 L.Ed.2d 609 (2008) (internal quotation marks omitted). The CWA "generally prohibits the discharge of pollutants into 'navigable waters' or 'waters of the United States.'" Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526, 530 (9th Cir. 2001). "By not defining further the meaning of 'waters of the United States,' Congress implicitly delegated policy-making authority to the EPA and the [Army Corps of Engineers], the agencies charged with the CWA's administration." San Francisco Baykeeper v. Cargill Salt Div., 481 F.3d 700, 704 (9th Cir. 2007) ("Cargill").

In passing the CWA, Congress declared "that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States [or] adjoining shorelines[.]" 33 U.S.C. § 1321(b)(1).[12] Under the CWA, "[t]he discharge of oil or hazardous substances (I) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . in such quantities as may be harmful as determined by the President . . . is prohibited[.]" Id. at § 1321(b)(3)[13]; see

---

11. Defendant also objects to the Government's evidence regarding the actual volume of discharges for each of the Seven Spills, claiming that while the Government now seeks to "prove up" the volume of the spills, the Government previously admitted that it had not yet determined the number of barrels of crude oil or produced water discharged during each of the Seven Spills. (See Dkt. 92–1, Motion at 16; Dkt. 94, Appendix, Exh. 39, United States' Response to [Defendant's] Seventh Set of Requests for Admission at ECF 207–218). However, the Government only admitted that it was not yet able to determine the precise amounts of the discharges and defendant has not cited to any evidence regarding the actual volume of the discharges. (See Dkt. 94, Appendix, Exh. 39 at ECF 207–218). Indeed, defendant acknowledges that the volume of the oil discharges may require expert testimony and is therefore not subject to the instant Motion. (See Dkt. 92–1, Motion at 3).

12. Unless otherwise indicated, all section references are to Title 33 of the United States Code.

13. Section 1321(b)(3) was amended in November 1978 to prohibit the discharge of oil "in such quantities as may be harmful[.]" Healy, 713 F.2d at 1476 (emphasis and internal quotation marks omitted). "Prior to the November 1978 amendments, section 1321(b)(3) prohibited the discharge of oil 'in harmful quantities[.]'" Id. The 1978 amendments set a lower standard for violation of the CWA. See id.; Orgulf Transp. Co. v. U.S., 711 F.Supp. 344, 347 (W.D. Ky. 1989) ("Under the plain reading of the 'may be harmful' language, the President is empowered to pro-

U.S. v. Healy Tibbitts Const. Co., 713 F.2d 1469, 1471 (9th Cir. 1983) ("Section 311(b)(3) of the Act (codified as amended 33 U.S.C. § 1321(b)(3)) was added to prohibit, inter alia, the discharge of harmful quantities of oil into the navigable waters in the United States; the President was required in section (b)(4) to determine, by regulation, what quantities were to be considered 'harmful.' ") (footnote omitted).

Section 1321(b)(4) of the CWA states that "[t]he President shall by regulation determine for the purposes of this section those quantities of oil and any hazardous substances the discharge of which may be harmful to the public health or welfare or the environment of the United States, including but not limited to fish, shellfish, wildlife, and public and private property, shorelines, and beaches." Pursuant to § 1321(b)(4), the EPA promulgated 40 C.F.R. § 110.3 to define "discharges of oil in such quantities that the Administrator has determined may be harmful" as either discharges that "(a) [v]iolate applicable water quality standards" or "(b) [c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines." 40 C.F.R. § 110.3; see also Healy, 713 F.2d at 1471–72 (outlining the history of the CWA and regulations concerning "the discharge of harmful quantities of oil into the navigable waters in the United States.").

### A. The Seven Spills at Issue.

Defendant seeks partial summary judgment on seven of the 12 spills underlying the Government's first claim under 33 U.S.C. § 1321(b)(3) of the CWA: (1) June 8, 2005—defendant reported a spill involving the release of one barrel ("bbl") of oil and 200 bbls of produced water into the Palmer Road Creek, (see Dkt. 92–3, SUF at P2–P5); (2) July 13, 2005—defendant reported a spill involving the release of 20 bbls of crude oil and 50 bbls of produced water into the Palmer Road Creek, (see id. at P6–P11); (3) August 12, 2005–defendant reported a spill into Cat Canyon Creek involving two bbls of crude oil and 20 bbls of produced water, (see id. at P21–P22); (4) July 16, 2007–defendant reported a spill of 80–90 bbls of crude oil with produced water into the Palmer Road Creek, (see id. at P27–P28); (5) December 27, 2008—defendant reported a spill containing five bbls of oil and 20 bbls of produced water into the Spring Canyon Tributary, (see id. at P38–39); (6) May 1, 2009—defendant reported a spill of at least three bbls of oil and two bbls of produced water into the Spring Canyon Tributary, (see id. at P50–53); and (7) October 14, 2010–defendant reported a spill of ten bbls of crude oil and five bbls of produced water into Palmer Road Creek. (See id. at P57–59) (collectively, the "Seven Spills"). At the time of each of the spills, "water was not flowing" at any of the creeks and tributaries at issue. (See id. at D5, D6, D7, D8, D10, D12, D14, D24). Defendant contends that the Government cannot produce evidence: (1) that the Seven Spills produced a film or sheen upon or discoloration of the surface of the water or a sludge or emulsion beneath the surface of water; or (2) that the discharges from the Seven Spills went onto "adjoining shorelines" within the meaning of the CWA. (See Dkt. 92–1, Motion at 3, 18).

#### 1. Quantities of Discharges as May Be Harmful.

Defendant asserts that the Government admitted in its discovery responses that, "after reasonable inquiry, the information

---

hibit a quantity which if discharged may be harmful. Thus, to be prohibited, the discharge

need not actually be harmful; it is prohibited if it may be harmful.") (emphasis omitted).

the United States knows or can readily obtain is insufficient to enable it to admit or deny" whether the spills "did not cause a film or sheen upon, or discoloration of the surface of water" or "cause a sludge or emulsion to be deposited beneath the surface of water" in either the Palmer Road Creek, Cat Canyon Creek, or the Spring Canyon Tributary. (See Dkt. 92–1, Motion at 10–11; Dkt. 92–3, SUF at D1, D2, D3, D4, D9, D11, D13.) Defendant further asserts that Palmer Road Creek, Cat Canyon Creek, and Spring Canyon Tributary were all dry at the time of the spills and the spills were quickly cleaned up. (See Dkt. 92–1, Motion at 18). According to defendant, the plain words of 40 C.F.R. § 110.3(b) make it clear that any film or sheen upon, discoloration of, or sludge or emulsion deposited beneath must be in relation to the surface of water and because there was no water present, the Government has no evidence demonstrating that any discharges were quantities "as may be harmful." (See id.). Defendant's assertions are unpersuasive.

First, defendant cites no authority to support its assertion that under 40 C.F.R. § 110.3(b), only a discharge of oil causing a film or sheen upon or discoloration on the surface of water, or sludge or emulsion beneath the surface of water, constitutes a quantity as may be harmful. (See, generally, Dkt. 92–1, Motion at 17–18; Dkt. 115, Defendant's Suppl. at 1–2). Second, 40 C.F.R. § 110.3(b) states that an oil discharge may be harmful if it results in "a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." (emphasis added). The use of the word "or" "is almost always disjunctive, that is, the words it connects are to be given separate meanings." Loughrin v. U.S., — U.S. ——, 134 S.Ct. 2384, 2390, 189 L.Ed.2d 411 (2014) (internal quotation marks omitted); Azure v. Morton, 514 F.2d 897, 900 (9th Cir. 1975) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately."); Coal. for Clean Air v. S. Cal. Edison Co., 971 F.2d 219, 225 (9th Cir. 1992), cert. denied, 507 U.S. 950, 113 S.Ct. 1361, 122 L.Ed.2d 740 (1993) (the use of the word "or" by Congress between "two separate triggering events" showed that Congress clearly intended that either one of the events would trigger the "EPA's obligation to promulgate" a plan). Here, the use of the word "or" means that the presence of a film, sheen, discoloration, sludge, or emulsion on an adjoining shoreline is sufficient to constitute quantities "as may be harmful." See In re Pacific Lumber Co., 584 F.3d 229, 245 (5th Cir. 2009) ("This court has subscribed to the obvious proposition that because the three subsections of [the statute] are joined by the disjunctive 'or,' they are alternatives."). In other words, the presence of a film, sheen, discoloration, sludge, or emulsion on or beneath the surface of water is not the only manner in which an oil discharge may be harmful under 40 C.F.R. § 110.3.[14]

---

14. Discharges of oil on an adjoining shoreline that violate applicable water quality standards are also sufficient to constitute quantities as may be harmful under 40 C.F.R. § 110.3(a). The court disagrees with defendant's contention that the Government has attempted to belatedly raise a new § 311 claim based on violations of applicable water quality standards. (See Dkt. 92–1, Motion at 18–21, 26–32). The FAC placed defendant on notice of this "alternative" theory. For instance, the FAC sets forth the full text of 40 C.F.R. § 110.3, (see Dkt. 56, FAC at ¶ 10), including the reference to applicable water quality standards. Plaintiffs also alleged that the Seven Spills were each of a quantity as "may be harmful" within the meaning of § 311(b)(3) and 40 C.F.R. § 110.3. (See id. at ¶ 125). In

At best, the evidence HVI relies on, (see Dkt. 92–3, SUF at D1–D14) merely establishes that Palmer Road Creek, Cat Canyon Creek, and Spring Canyon Tributary were dry at the time of the spills and thus the spills did not cause a film or sheen upon, or discoloration of the surface of water, or cause a sludge or emulsion to be deposited beneath the surface of water. However, as discussed below, see infra at § II.A.2., the borders of the subject creeks and tributaries constitute "adjoining shorelines" within the meaning of the CWA, and the Government has presented undisputed evidence indicating that quantities of oil and produced water were spilled during each of the Seven Spills including: (1) one bbl of crude oil and 200 bbls of produced water during the June 8, 2005, Palmer Road Creek spill, (see Dkt. 92–3, SUF at P3); (2) 20 bbls of crude oil and 50 bbls of produced water during the July 13, 2005, Palmer Road Creek spill, (see id. at P7–8); (3) two bbls of crude oil and 20 bbls of produced water during the August 12, 2005, Cat Canyon Creek spill, (see id. at P21); (4) between 80 to 90 bbls of crude oil with produced water during the July 16, 2007, Palmer Road Creek spill, (see id. at P27); (5) five bbls of oil and 20 bbls of produced water during the December 27, 2008, Spring Canyon Tributary spill, (see id. at P38); (6) 15 bbls of oil and produced water during the May 1, 2009, Spring Canyon Tributary spill, (see id. at P51); and (7) ten bbls of crude oil and five bbls of produced water during the October 14, 2010, Palmer Road Creek spill.[15] (See id. at

any event, even assuming reliance on water quality standards constitutes a new claim, a court may permit a party to amend its pleadings even in the face of a pending motion for summary judgment. See Edwards v. Occidental Chem. Corp., 892 F.2d 1442, 1445 n. 2 (9th Cir. 1990) (although the plaintiff did not formally request leave to amend as part of her opposition to the defendant's motion for summary judgment, that "did not preclude" the district court from granting leave to amend); Ferris v. Santa Clara Cty., 891 F.2d 715, 718 (9th Cir. 1989), cert. denied, 498 U.S. 850, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990) ("Leave to amend following summary judgment may be granted at the discretion of the court."). In determining whether to grant leave to amend, the court considers the existence of "(1) bad faith on the part of the plaintiffs; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the proposed amendment." Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 986 (9th Cir. 1999). Delay alone is not dispositive, see id. and here, there is no showing of bad faith or prejudice as the FAC gave defendant "fair notice of the facts supporting" the Government's claim, see Hall v. City of Los Angeles, 697 F.3d 1059, 1073 (9th Cir. 2012) (waiting two years from the filing of the initial complaint did not bar the district court from granting leave to amend when the original complaint gave fair notice), and any claim based on water quality standards would be based on the same underlying facts and would require little, if any, additional discovery. See Thieme v. Cobb, 2016 WL 3648531, *5 (N.D. Cal. 2016) (the court did not find prejudice when there was no showing of a need to conduct "significant additional discovery").

15. Citing the Government's responses to its Requests for Admissions, defendant claims that the Government admitted in its discovery responses that it has no evidence that any of the Seven Spills discharged a harmful quantity of oil. (See Dkt. 115, Defendant's Supp. at 1; Dkt. 92–3, SUF at D1–D4, D9, D11 D13). However, HVI overreaches in its reading of the government's discovery responses. Here, the cited evidence, (see Dkt. 92–3, SUF at D1–D4, D9, D11 D13), only reflects that the Government has admitted there is no evidence there was a "film or sheen upon, or discoloration on the surface of water." However, that does not mean the Government admitted to having no evidence for its claim based on adjoining shorelines. Further, the Government admitted only that it had not yet come to a decision as to the number of barrels of oil and produced water that was discharged by defendant in each spill. (See Dkt. 93, Appendix, Exh. 3 at ECF 31, 33, 35, 37, 39, 41, 43). It may be that the actual volumes of HVI's discharges were higher than what HVI reported. Nevertheless, it is undisputed that each spill involved an amount that "may be

P57). In addition, oil sheen or discoloration of a dry creek or tributary was observed during the: (1) July 13, 2005, Palmer Road Creek spill (see Dkt. 92–3, SUF at P15 & P19); (2) August 11, 2005, Cat Canyon Creek spill (see id. at P25); and (3) December 27, 2008, Spring Canyon Tributary spill. (See id. at P45–46). Oil or produced water also reached a dry creek or tributary during the: (1) June 8, 2005, Palmer Road Creek spill (see id. at P4–5); (2) July 16, 2007, Palmer Road Creek spill (see id. at P28); (3) May 1, 2009, Spring Canyon Tributary spill (see id. at P53); and (4) October 14, 2010, Palmer Road Creek spill. (See id. at P61). In short, the Government has put forth undisputed evidence to establish the discharge of oil in "quantities as may be harmful" based on the existence of a film or sheen upon or discoloration, of the adjoining shorelines of the subject creeks and tributaries. See Healy, 713 F.2d at 1476 (actual harmfulness not required); cf. Orgulf, 711 F.Supp. at 346 (in discussing sheen on the surface of water, the court noted that "[t]he practical effect of the sheen test was to treat all discharges of oil as violations of Section 311 because a spill of even the most minuscule quantity of oil creates a sheen") (emphasis omitted).

### 2. "Adjoining Shorelines."

Defendant asserts that the term, "adjoining shorelines," under § 311 and 40 C.F.R. § 110.3(b) has no statutory definition and, relying on various dictionary definitions, contends that the term should be interpreted to include only the "fringe of land at the edge of a large body of water, such as an ocean, sea, lake or river" and not the edge of smaller bodies of water

such as a stream or tributary. (See Dkt. 92–1, Motion at 35, 40) (emphasis added). Defendant's assertions are unpersuasive.

Other courts, in examining and applying the CWA and other statutes, have used "adjoining shoreline" to refer not only to land adjoining oceans, lakes, or large rivers, but also to land adjoining streams, creeks, runs, marshes, and ponds. See, e.g., U.S. v. Colonial Pipeline Co., Inc., 242 F.Supp.2d 1365, 1373–75 (N.D. Ga. 2002) (in a case involving the CWA, the court referred to the discharges of oil into several unnamed creeks and pond and their adjoining shorelines); Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wis., 740 F.Supp. 1400, 1409 (W.D. Wis. 1990) ("Approximately 60% of the state's estimated 161,000 wild mink live in the ceded territory, mainly on shorelines along lakes, marshes, streams and rivers[.]"); Quaker State Corp. v. U.S. Coast Guard, 1990 WL 272708, *1 & *4 (W.D. Pa. 1990) (a case under the CWA which involved the presence of an oil sheen on the surface of a small tributary and "dried oil on the shoreline" of the tributary); Simpson v. U.S., 564 F.Supp. 945, 947 (C.D. Cal. 1982) (referring to the "shoreline" of a stream); Harleysville Mut. Ins. Co. v. U.S., 226 Ct.Cl. 713, 714 n. 5 (Ct. Claims 1981) (in denying a motion to dismiss an action to recover for the cleanup costs of an oil spill, the court noted the petition alleged that the spill occurred near a tributary, which was sufficient to possibly state a claim based on the discharge of oil "into or upon adjoining shorelines" under 33 U.S.C. § 1321(b)(3)).

harmful" as each spill exceeded the one-barrel threshold the EPA specifically rejected in its rulemaking in determining whether there was a minimum amount of spilled oil that "may be harmful." See 52 Fed. Reg. 10712, 10716 (April 2, 1987) (rejecting a suggestion that the EPA adopt a volumetric alternative to the sheen test with a "reportable quantity threshold" of one barrel of oil because scientific literature and studies clearly showed that even small quantities of oil discharge can harm the environment).

In addition, even under defendant's dictionary references, it is not clear that the word "shoreline" or the term "adjoining shorelines" apply only to large bodies of water. For example, The American Heritage Dictionary defines "shoreline" as "the line where a body of water and the shore meet." (See Dkt. 92–1, Motion at 34) (quoting The American Heritage Dictionary, Second College Edition 1332 (1991)) (internal quotation marks omitted). Another dictionary defines "shore" as "the land bordering a usu. [usually] large body of water; specif. [specifically]: Coast." (Id.) (quoting Merriam–Webster's Collegiate Dictionary 1151 (11th Ed.); Webster's Third New International Dictionary (Unabridged) (1986)) (internal quotation marks omitted). The Merriam–Webster Collegiate Dictionary likewise defines "shoreline" as the "the line where a body of water and the shore meet." Merriam–Webster Collegiate Dictionary 1081 (10th ed. 2001). The same dictionary defines "adjoining" as "touching or bounding at a point or line." (See Dkt. 92–1, Motion at 34) (quoting Merriam–Webster's Collegiate Dictionary at 16) (internal quotation marks omitted). In short, even the dictionary definitions provided by defendant (see Dkt. 92–1, Motion at 34–35), do not clearly establish that the word "shoreline" or the term "adjoining shorelines" apply only to large bodies of water.

 Nevertheless, defendant asserts that the term "adjoining shorelines" has an ordinary, common, and natural meaning that is unambiguous and, as a result, the court need not "resort to maxims of statutory construction such as nosci-tur a sociis or ejusdem generis[.]" [16] (See Dkt. 92–1, Motion at 35). According to defendant, it would be illogical to conclude that the term "adjoining shorelines" includes the edges of "ephemeral, unnamed 'tributaries' " such as Palmer Road Creek, Cat Canyon Creek, and Spring Canyon Creek, because "[s]uch surface features are ubiquitous on the land within the United States ... in virtually every field, meadow, hill, and mountain, as well as along most roads." (Dkt. 92–1, Motion at 35). Further, defendant contends that the legislative history of the CWA makes it clear that Congress never intended for the phrase "adjoining shorelines" to include the edges of streams or tributaries. (See id. at 36–40). HVI's contentions are unpersuasive.

 "When interpreting a statute, the court begins with the statutory text and interprets statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary. [W]e must read the words [of a statute] in their context and with a view to their place in the overall statutory scheme. Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme." I.R. ex rel. E.N. v. Los Angeles Unified Sch. Dist., 805 F.3d 1164, 1167 (9th Cir. 2015) (internal quotation marks and citations omitted; alterations in original); see Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997) (In addition to the language itself, "[t]he plainness or ambiguity of statutory language is determined by reference to the

---

16. Noscitur a sociis refers to the notion that "a word is known by the company it keeps[.]" S.D. Warren Co. v. Me. Bd. of Envtl. Prot., 547 U.S. 370, 378, 126 S.Ct. 1843, 1849, 164 L.Ed.2d 625 (2006) (internal quotation marks omitted). Ejusdem generis stands for the proposition "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Wash. State Dep't. of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384, 123 S.Ct. 1017, 1025, 154 L.Ed.2d 972 (2003) (internal quotation marks omitted).

... the specific context in which that language is used, and the broader context of the statute as a whole."). A review of the entire statutory scheme is especially important for a complex regulatory statute such as the CWA. See, e.g., San Luis & Delta–Mendota Water Auth. v. U.S., 672 F.3d 676, 685 (9th Cir. 2012) (describing the CWA as a complex statutory and regulatory scheme); Chubb Custom Ins. Co. v. Space Systems/Loral, Inc., 710 F.3d 946, 958 (9th Cir. 2013), cert. denied, ─── U.S. ───, 134 S.Ct. 906, 187 L.Ed.2d 833 (2014) (characterizing CERCLA as a "web of sections, subsections, definitions, exceptions, defenses, and administrative provisions") (internal alterations and quotation marks omitted).

A court is, "however, cautioned against following a literal interpretation of a statute that would thwart the overall statutory scheme or lead to an absurd result." Chubb, 710 F.3d at 958. A court should "not [be] guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." Dole v. United Steelworkers of Am., 494 U.S. 26, 35, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990) (internal quotation marks omitted); see FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132, 120 S.Ct. 1291, 1300–01, 146 L.Ed.2d 121 (2000) (A court must recognize that "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). In addition, a court "should be cautious of relying too heavily on dictionary definitions ... because rigid adherence to such definitions may result in an interpretation that conflicts with the legislature's intent in enacting the given statute." Ileto v. Glock, Inc., 421 F.Supp.2d 1274, 1285 (C.D. Cal. 2006). It is only when an ambiguity remains after an examination of the plain language of the statute, its structure, and

its purpose that a court should resort to legislative history. See U.S. v. Real Prop. Located at 475 Martin Lane, Beverly, Hills, CA, 545 F.3d 1134, 1143 (9th Cir. 2008) ("Where, as here, we resolve a question of statutory interpretation by examining the plain language of the statute, its structure, and purpose, our judicial inquiry is complete, and we need not consult a statute's legislative history.") (internal quotation marks omitted); see also Probert v. Fam. Centered Servs. of Alaska, Inc., 651 F.3d 1007, 1011 (9th Cir. 2011), cert. denied, 565 U.S. 1235, 132 S.Ct. 1635, 182 L.Ed.2d 233 (2012) ("In ascertaining the meaning of an ambiguous term, [a court] may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent.") (internal quotation marks omitted).

"[T]he CWA defines 'navigable waters' as 'the waters of the United States, including the territorial seas[,]'" Rapanos v. U.S., 547 U.S. 715, 723, 126 S.Ct. 2208, 2215, 165 L.Ed.2d 159 (2006) (quoting 33 U.S.C. § 1362(7)), "but does not further describe what is included as part of 'waters of the United States.'" U.S. v. Krilich, 209 F.3d 968, 970 (7th Cir.), cert. denied, 531 U.S. 992, 121 S.Ct. 482, 148 L.Ed.2d 455 (2000). The definition of "waters of the United States" under the CWA has been expanded "to include some intrastate water bodies that are not navigable in the traditional sense." Cargill, 481 F.3d at 704; U.S. v. Cundiff, 555 F.3d 200, 206 (6th Cir.), cert. denied, 558 U.S. 818, 130 S.Ct. 74, 175 L.Ed.2d 27 (2009) (recognizing that the term "navigable waters" now includes tributaries and other waters that would not be traditionally considered "navigable."); U.S. v. TGR Corp., 171 F.3d 762, 764 (2d Cir. 1999) ("The term 'waters of the United States' has a very broad meaning under the [CWA]."); U.S. v. Tex. Pipe Line Co., 611 F.2d 345, 346–47 (10th Cir.

1979) (concluding that an unnamed tributary of a creek is a "water of the United States" and noting that Congress intended the term "navigable waters" to be used broadly); U.S. v. Lambert, 695 F.2d 536, 538 (11th Cir. 1983) ("It is generally agreed that Congress intended 'waters of the United States' to reach to the full extent permissible under the Constitution."). For example, "a tributary of waters of the United States is itself a water of the United States." U.S. v. Moses, 496 F.3d 984, 988 n. 8 (9th Cir. 2007), cert. denied, 554 U.S. 918, 128 S.Ct. 2963, 171 L.Ed.2d 886 (2008).[17] Also, "a seasonally intermittent stream which ultimately empties into … a water of the United States can, itself, be a water of the United States."[18] Id. at 989. In short, "even a creek which is dry for months may constitute a tributary that is a Water of the United States." San Francisco Baykeeper, 791 F.Supp.2d at 763; see, e.g., Driscoll v. Adams, 181 F.3d 1285, 1291 (11th Cir. 1999), cert. denied, 529 U.S. 1108, 120 S.Ct. 1961, 146 L.Ed.2d 793 (2000) (holding that a stream is still a "navigable water" under the CWA "even if it flows only intermittently."); U.S. v. Tex. Pipe Line Co., 528 F.Supp. 728, 731 (E.D. Okla. 1978) ("[T]he FWPCA Amendments of 1972 are applicable to the tributaries of

navigable waters and this is so regardless of whether there is a continuous flow of water from the point of an oil spill, through any intermediate tributaries and eventually into navigable waters at the specific time of an oil spill."); U.S. v. Sheyenne Tooling & Mfg. Co., Inc., 952 F.Supp. 1414, 1417 (D. N.D. 1996) (a normally dry stream may constitute a "water of the United States"); Sequoia Forestkeeper v. U.S. Forest Serv., 2011 WL 902120, *5 (E.D. Cal. 2011) (a stream that dries up in the summer months "qualifies as a navigable water" under the CWA); U.S. v. Brink, 795 F.Supp.2d 565, 578–79 (S.D. Tex. 2011) (finding a seasonally intermittent and non-navigable tributary to constitute " 'waters of the United States' "); U.S. v. Zanger, 767 F.Supp. 1030, 1034 (N.D. Cal. 1991) ("a tributary of other 'waters of the United States' " is also covered by the CWA); Eoff v. E.P.A., 2015 WL 2405658, *4 (E.D. Ark. 2015) (seasonal creek with twenty "flow events" a year is a "water of the United States").

"It is the intent of the Clean Water Act to cover, as much as possible, all waters of the United States instead of just some." Quivira Mining Co. v. EPA, 765 F.2d 126, 129 (10th Cir. 1985), cert. denied,

---

17. Defendant argues that the Government's reliance on Moses is misplaced because that case concerned a different provision of the CWA, 33 U.S.C. § 1311(a), which does not contain a requirement of "quantities which may be harmful." (See Dkt. 115, Defendant's Suppl. at 1–2). While Moses did not involve § 311, a key question before the Ninth Circuit was whether an often-dry portion of the creek that was polluted by defendant constituted a "water of the United States." See 496 F.3d at 987–89. The defendant in Moses argued that he could not have violated § 1311(a) given that no water was running in the creek at the time of the discharge. See id. at 991. The Ninth Circuit rejected this argument, stating that "[c]ommon sense tells us that, … the mere fact that pollutants are deposited while this part of Teton Creek is dry cannot make a

significant difference. To hold otherwise would countenance significant pollution of the waters of the United States as long as the polluter dumped the materials at a place where no water was actually touching them at the time." Id.

18. The Moses court noted that in Rapanos, "the Supreme Court unanimously agreed that intermittent streams (at least those that are seasonal) can be waters of the United States." Moses, 496 F.3d at 991. As Justice Kennedy explained in Rapanos, excluding an often-dry watercourse from the protection of the CWA ignores the reality of water flows in the western parts of the United States. See 547 U.S. at 769–70, 126 S.Ct. at 2242 (Kennedy, J. concurring).

474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). Here, while Palmer Road Creek, Cat Canyon Creek, and Spring Canyon Tributary were dry at the time of each of the Seven Spills, defendant has not presented any evidence suggesting that they are anything other than seasonally intermittent tributaries [19] or streams as plaintiffs contend. (See, generally, Dkt. 92–3, SUF). Nor does defendant challenge plaintiffs' assertion that they eventually flow into traditionally navigable waters. (See, generally, Dkt. 92–1, Motion at 34–40). In short, the court finds that Palmer Road Creek, Cat Canyon Creek, and Spring Canyon Tributary are "navigable waters" within the meaning of the CWA. See Headwaters, 243 F.3d at 534 ("The Clean Water Act is concerned with the pollution of tributaries as well as with the pollution of navigable streams, and it is incontestable that substantial pollution of one not only may but very probably will affect the other.") (internal quotation marks omitted); N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 997 (9th Cir. 2007), cert. denied, 552 U.S. 1180, 128 S.Ct. 1225, 170 L.Ed.2d 61 (2008) ("The Supreme Court has since confirmed that regulable waters of the United States include tributaries of traditionally navigable waters and wetlands adjacent to navigable waters and their tributaries.") (citing U.S. v. Riverside Bayview Homes, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985)); Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc., 124 F.Supp.3d 1007, 1017–18 (E.D. Cal. 2015) (determining that a ravine flowing into a creek which in turn flows into a river is "navigable waters" under the CWA).

With respect to defendant's interpretation of "adjoining shorelines," the court believes it is unduly narrow and inconsistent with the purpose and overall structure of the CWA. Congress has clearly stated "that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States[ or] adjoining shorelines[.]" 33 U.S.C. § 1321(b)(1). "The Clean Water Act § 311, as amended by the Oil Pollution Act of 1990, focuses on the prevention of and response to oil spills." Native Village of Point Hope v. Salazar, 680 F.3d 1123, 1127 (9th Cir. 2012). "[T]he statute by its terms seeks to inhibit even small, careless oil spills." U.S. v. Indep. Bulk Transp., Inc., 480 F.Supp. 474, 479 (S.D. N.Y. 1979) (citing § 1321(b)(1)).

Defendant's narrow interpretation of "adjoining shorelines" would permit significant discharges of oil into dry tributaries that ultimately run into traditionally navigable waters despite clear Congressional intent to stop the discharge of oil and to broadly protect the "waters of the United States." Given that the term "navigable waters" is to be applied broadly under the CWA, see Riverside Bayview, 474 U.S. at 133, 106 S.Ct. at 462 ("Congress chose to define the waters covered by the [CWA] broadly."); Leslie Salt Co. v. Froehlke, 578 F.2d 742, 754–55 (9th Cir. 1978) ("This court has indicated that the term 'navigable waters' within the meaning of the [CWA] is to be given the broadest possible constitutional interpretation[.]"); accord U.S. v. Byrd, 609 F.2d 1204, 1209 (7th Cir. 1979); TGR Corp., 171 F.3d at 764; Lambert, 695 F.2d at 538; U.S. v. Ashland Oil & Transp. Co., 504 F.2d 1317, 1323–24 (6th Cir. 1974), it makes little sense to interpret the term "navigable waters" broadly while enforcing a narrow interpretation of "adjoining shorelines." See Slaven v. BP America, Inc., 973 F.2d

---

**19.** A tributary is "[a] stream which contributes its flow to a large stream or other body of water." Headwaters, 243 F.3d at 533 (internal quotation marks omitted).

1468, 1472 (9th Cir. 1992) ("The difficulty with [defendant's] position is that it asks this court to apply one reading of a particular subsection in isolation from the rest of the statute. As a tenet of statutory construction, however, the plain language rule does not examine statutory words in a vacuum. Rather, courts must consider a statutory provision's phraseology in light of the overall structure and purpose of the legislation."). Such a result would render the CWA incoherent by protecting tributaries that are not traditionally navigable waters under 33 C.F.R. § 328.3(a)(1) while arbitrarily not affording the land bordering such tributaries the same protection. See Royal Foods Co., Inc. v. RJR Holdings Inc., 252 F.3d 1102, 1108 (9th Cir. 2001) (a court must look beyond plain language if such a literal interpretation leads to an absurd result thwarting the purpose of the overall statutory scheme). "A court must [ ] interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole[.]" Brown & Williamson, 529 U.S. at 133, 120 S.Ct. at 1301 (citations and internal quotation marks omitted).

In short, having considered the plain language, structure and purpose of the CWA,[20] see Real Prop., 545 F.3d at 1143 ("Where [the court] resolve[s] a question of statutory interpretation by examining the plain language of the statute, its structure, and purpose, [the court's] judicial inquiry is complete, and [the court] need not consult a statutory's legislative history.") (internal quotation marks omitted), including the goal of the CWA to "restore and maintain the chemical, physical and biological integrity of [the] Nation's waters[,]" Ass'n. to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc., 299 F.3d 1007, 1009 (9th Cir. 2002) (internal quotation marks omitted), and because "the term 'navigable waters' is not limited to oceans and other very large bodies of water[,]" Rice v. Harken Exploration Co., 250 F.3d 264, 269 (5th Cir. 2001), the court concludes that "adjoining shorelines" within the meaning of § 311 and 40 C.F.R. § 110.3 includes the edges of streams and tributaries such as Palmer Road Creek, Cat Canyon Creek and the Spring Canyon Tributary.[21] Thus,

---

20. Although the court does not believe it is necessary to resort to legislative history, see Int'l Ass'n of Machinists, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Grp., 387 F.3d 1046, 1051–52 (9th Cir. 2004) (if the examination of the language at issue including the broader context of the statute as a whole does not reveal an ambiguity, then there is no need to examine "extrinsic indicia of legislative intent, like legislative history."), the court notes that defendant's examination of the legislative history of the CWA, (see Dkt. 92–1, Motion at 36–40), reveals little specific discussion of the term "adjoining shorelines" and therefore is of little, if any, value. See Real Prop., 545 F.3d at 1144 (the principle of not consulting legislative history when there is no ambiguity "is especially true when [the] legislators' published statements do not squarely address the question presented") (internal quotation marks omitted).

21. Further support for this conclusion can be found elsewhere in § 311, as amended by the Oil Pollution Act of 1990, which "provides a framework for preventing and responding to potential oil spills." Alaska Wilderness League v. Jewell, 788 F.3d 1212, 1215 (9th Cir. 2015). As part of this regulatory scheme, 33 U.S.C. § 1321(b)(5) requires a "person in charge ... of an onshore facility ... [to] immediately notify the appropriate agency of the United States Government of such discharge." Section 311 defines " 'onshore facilit[ies]' " as "any kind located in, on, or under, any land within the United States other than submerged land[.]" 33 U.S.C. § 1321(a)(10). Pursuant to § 1321(c)(1)(A), the President is to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance ... (ii) on the adjoining shorelines to the navigable waters[.]" (emphasis added). Congress did not use language suggesting that the term "adjoining shore-

defendant's Motion regarding the Government's First Claim for violations of § 311 of the CWA is denied.

## III. THE REGIONAL BOARD'S SIXTH CLAIM UNDER THE CALIFORNIA WATER CODE.

California Water Code § 13350(a)(3) provides in pertinent part that "[a] person who ... causes or permits any oil or any residuary product of petroleum to be deposited in or on any of the waters of the state, except in accordance with waste discharge requirements or other actions or provisions of this division, shall be liable civilly[.]" The term "waters of the state" is defined in as "any surface water or groundwater, including saline waters, within the boundaries of the state." Cal. Water Code § 13050(e).

Defendant seeks summary adjudication on six of the 17 spills underlying the Regional Board's Sixth Claim for violations of California Water Code § 13350(a): (1) the June 8, 2007, Bradley 3–Island spill; (2) the July 16, 2007, Bell spill; (3) the December 27, 2008, Bell spill; (4) the May 1, 2009, Bell spill; (5) the July 2, 2009, Bell spill; and (6) the October 14, 2010, Bell spill (collectively, the "Six Spills"). (See Dkt. 92–1, Motion at 51–53). Defendant, again relying on a dictionary definition, asserts that "waters of the state" under California Water Code § 13050(e) is limited to "the liquid that descends from the clouds as rain, forms streams, lakes, and seas[.]" (Dkt. 92–1, Motion at 55) (quoting Merriam–Webster's Collegiate Dictionary (10th ed. 1999)). According to defendant, given that the sites where the Six Spills occurred were dry and promptly cleaned up, the Regional Board cannot produce evidence establishing that any of the Six Spills violated California Water Code § 13350(a)(3). (See Dkt. 92–1, Motion at 56; Dkt. 115, Defendant's Suppl. at 8). Defendant's assertions are unpersuasive.

■■■ "In a case requiring a federal court to apply California law, the court must apply the law as it believes the California Supreme Court would apply it." Kairy v. SuperShuttle Intern., 660 F.3d 1146, 1150 (9th Cir. 2011) (internal quotation marks omitted). When there is no controlling decision from the California Supreme Court, a court "must predict how the California Supreme Court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids." Id. (internal quotation marks omitted); see Garcia v. PacifiCare of Cal., Inc., 750 F.3d 1113, 1116 (9th Cir. 2014) ("In answering a question of California law, this court predicts how the highest California court would decide the issue.") (alterations and internal quotation marks omitted); Walker v. City of Lakewood, 272 F.3d 1114, 1125 (9th Cir. 2001), cert. denied, 535 U.S. 1017, 122 S.Ct. 1607, 152 L.Ed.2d 621 (2002) ("Because the California Supreme Court has not addressed this question, our task is to predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.") (internal quotation marks omitted); see also Daghlian v. DeVry Univ., Inc., 461 F.Supp.2d 1121, 1126–27 (C.D. Cal. 2006) ("The parties have not cited, nor has the court found, any case that directly addresses the question presented here. To resolve the issue, therefore, the court must interpret the pertinent provisions of the [ ]

lines" applies only to the edges of large bodies of water, but instead used the word "to" without any other words of limitation, indi-

cating that "adjoining shorelines" applies to all "navigable waters" of the United States.

Act, following California's rules of statutory construction.").

It has long been established in California jurisprudence that the existence of a stream, creek or water course [22] is not compromised by the intermittent nature of its water flow. See, e.g., Cty. of Sierra v. Nevada Cty., 155 Cal. 1, 8, 99 P. 371 (1908) ("[T]here are places in the channel … which are dry, but a watercourse does not lose its character as such because in dry seasons, or under certain climatic conditions its channel may become dry in places."); Lindblom v. Round Valley Water Co., 178 Cal. 450, 452–53, 173 P. 994 (1918) (noting that a seasonal stream "was of the character familiar in this state, and in other semi-arid regions" and that it is "not necessary to the existence of a watercourse that the flow should be continuous throughout the year"); Cederburg v. Dutra, 3 Cal.App. 572, 575, 86 P. 838 (1906) (A stream "need not flow continually. It may sometimes be dry.") (internal quotation marks omitted). The term "stream" is commonly understood as "a watercourse having a source and terminus, banks and channel, through which waters flow, at least periodically. Streams usually empty into other streams, lakes, or the ocean, but a stream does not lose its character, as a watercourse even though it may break up and disappear." Lukrich v. Rodgers 176 Cal.App.2d 1, 7, 1 Cal.Rptr. 30 (1959) (internal quotation marks omitted); see Rutherford v. State of Cal., 188 Cal.App.3d 1267, 1279, 233 Cal.Rptr. 781 (1987) ("[A] stream need not flow continuously and sometimes due to climatic conditions may outwardly appear dry."); People v. Weaver, 147 Cal.App.3d Supp. 23, 30, 197 Cal. Rptr. 521 (1983) ("Although the reader might visualize a stream as a watercourse through which water flows during all times of the year, the term 'stream' is more broadly defined" to include waters that do not flow continuously).

In California, the "fundamental task" of a court "is to ascertain the [California] Legislature's intent so as to effectuate the purpose of the statute." Smith v. Super. Ct., 39 Cal.4th 77, 83, 45 Cal.Rptr.3d 394, 137 P.3d 218 (2006). While a court must first examine "the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose[,]" a court must also be mindful that it must "not consider … statutory language in isolation." State Farm Mut. Auto. Ins. Co. v. Garamendi, 32 Cal.4th 1029, 1043, 12 Cal.Rptr.3d 343, 88 P.3d 71 (2004) (internal quotation marks omitted). The court must "examine the entire substance of the statute in order to determine the scope and purpose of the provision, construing its words in context and harmonizing its various parts." Id. (internal quotation marks omitted). "We give the words their usual and ordinary meaning while construing them in light of the statute as a whole and the statute's purpose[.] In other words, we do not construe statutes in isolation, but rather read every statute with reference to the entire scheme

---

**22.** A "water course" "consist[s] of a running stream of water following a regular course or channel and possessing a bed and banks. It is the channel through which the water of a particular district or watershed usually or periodically flows. While it is ordinarily defined as a stream, containing a definite bed, banks and channel, which flows into some other river, stream, lake or the sea, none of those characteristics is an absolute fixed factor." Phillips v. Burke, 133 Cal.App.2d 700, 703, 284 P.2d 809 (1955) (internal citation and quotation marks omitted); see Ortega Rock Quarry v. Golden Eagle Ins. Corp., 141 Cal. App.4th 969, 973, 46 Cal.Rptr.3d 517 (2006) (characterizing a creek as an "intermittent water course").

of law of which it is part so that the whole may be harmonized and retain effectiveness[.]" Pineda v. Williams–Sonoma Stores, Inc., 51 Cal.4th 524, 529–30, 120 Cal.Rptr.3d 531, 246 P.3d 612 (2011) (internal citations and quotation marks omitted). Also, the court must follow the "general rule that civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose." Id. at 530, 120 Cal.Rptr.3d 531, 246 P.3d 612 (internal quotation marks omitted).

■ "The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" City of Burbank v. State Water Res. Control Bd., 35 Cal.4th 613, 620, 26 Cal.Rptr.3d 304, 108 P.3d 862 (2005) (quoting Ark. v. Okla., 503 U.S. 91, 101, 112 S.Ct. 1046, 1054, 117 L.Ed.2d 239 (1992)). "Under the federal Clean Water Act, each state is free to enforce its own water quality laws so long as its effluent limitations are not less stringent than those set out in the Clean Water Act. (33 U.S.C. § 1370)." Cal. Sportfishing Prot. All. v. State Water Res. Control Bd., 160 Cal.App.4th 1625, 1637, 73 Cal.Rptr.3d 560 (2008) (internal quotation marks omitted). In California, "[a] complex federal and state regulatory scheme promulgated under the federal Clean Water Act and the Porter–Cologne Act governs the quality of our waters." Id.

In enacting the Porter–Cologne Act,[23] the California Legislature declared "that the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state, and that the quality of all the waters of the state shall be protected for use and enjoyment by the people of the state." Cal. Water Code § 13000. The California Legislature further declared "that activities and factors which may affect the quality of the waters of the state shall be regulated to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." Id.

■ The goal of the Porter–Cologne Act "is 'to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.'"[24] Cal. Ass'n. of Sanitation Agencies v. State Water Res. Control Bd., 208 Cal.App.4th 1438, 1444, 146 Cal.Rptr.3d 501 (2012) (quoting Cal. Water Code § 13000). California Water Code § 13350 is "intended to encourage hazardous waste handlers to be careful in their operations and to avoid spills."[25]

---

23. In 1972, the Porter–Cologne Act was amended to "ensure consistency with the requirements for state programs implementing the Federal Water Pollution Control Act." City of Burbank, 35 Cal.4th at 620, 26 Cal. Rptr.3d 304, 108 P.3d 862 (internal quotation marks omitted).

24. "The task of accomplishing [the goal of the highest water quality] belongs to the State Water Resources Control Board (State Board) and the nine Regional Water Quality Control Boards; together the State Board and the regional boards comprise 'the principal state agencies with primary responsibility for the coordination and control of water quality.'" City of Burbank, 35 Cal.4th at 619, 26 Cal. Rptr.3d 304, 108 P.3d 862 (quoting Cal. Water Code § 13001.) Although the State Board sets the statewide policy for water quality control, each of the regional boards formulates and adopts water quality control plans for their respective regions. Id.

25. "[C]ivil liability imposed by section 13350 ... is punitive in nature in that it seeks to deter oil spills in state waters and, by making it costly to be held responsible for them, to

City of Modesto Redevelopment Agency v. Super. Ct., 119 Cal.App.4th 28, 43, 13 Cal. Rptr.3d 865 (2004). Further, as noted above, "[i]t is thoroughly established in California that [a] constant flow of water is not essential to the existence of a watercourse. It is sufficient if, during some seasons, water does in fact flow in the stream bed." Mogle v. Moore, 16 Cal.2d 1, 8, 104 P.2d 785 (1940) (citation and internal quotation marks omitted); see Rutherford, 188 Cal.App.3d at 1279–80, 233 Cal.Rptr. 781 (a stream does not have to flow continuously throughout the year).

 Laws concerning the conservation of public resources "'are of great remedial and public importance and thus should be construed liberally.'" Cal. Forestry Ass'n. v. Cal. Fish & Game Com'n., 156 Cal.App.4th 1535, 1545, 68 Cal.Rptr.3d 391 (2007) (quoting San Bernardino Valley Audubon Soc'y v. City of Moreno Valley, 44 Cal.App.4th 593, 601, 51 Cal.Rptr.2d 897 (1996)). Here, HVI's narrow interpretation of "waters of the state," which is based on ₁one dictionary definition, (see Dkt. 92–1, Motion at 55), ignores and is inconsistent with the nature and purpose of the Porter–Cologne Act and the CWA, as well as a century's worth of California case law concluding that a constant flow of water is not essential to the existence of a water course or stream. In other words, a water course or stream does not cease being a water course or stream simply because water does not flow continuously through it throughout the year. The Regional Board has presented undisputed evidence that each of the Six Spills resulted in the spillage of oil and produced water into seasonally flowing streams and creeks.[26] (See Dkt. 92–1, Motion at 53; Dkt. 92–3, SUF at P68–69). In addition to the oil itself, a spill involving produced water is potentially harmful because not only does it contain heavy metals and other chemical additives, it also soaks into the soil which makes it difficult to detect and remove. (See Dkt. 93, Appendix, Exh. 21,

---

impress upon the public the necessity of taking every precaution against their occurrence." People ex rel. Younger v. Super. Ct. of Alameda Cty., 16 Cal.3d 30, 37, 127 Cal.Rptr. 122, 544 P.2d 1322 (1976); see City of Modesto, 119 Cal.App.4th at 43, 13 Cal.Rptr.3d 865 ("[I]t appears section 13350 was intended to encourage hazardous waste handlers to be careful in their operations and to avoid spills."). Imposing liability for the discharge of oil into seasonally dry creeks furthers the California Legislature's goals of deterring oil spills and holding any party causing or permitting such a spill responsible.

26. Defendant's supplemental brief takes issue (see Dkt. 115, Defendant's Suppl. at 8) with the Regional Board's statement that it "should be allowed to prove at trial that once Palmer Road Creek and Spring Canyon Tributary resumed surface flow after the Six 13350 Spills, the residual crude oil and harmful produced water substances left behind were in and on the following stream." (See Dkt. 92–1, Motion at 59). Defendant claims plaintiffs and their privities signed sheets indicating that no further cleanup was required and therefore the Regional Board is estopped from asserting anything to the contrary. (See Dkt. 115, Defendant's Supp. at 9). Defendant's contention is unavailing because the referenced sheets do not preclude the Regional Board's claims. (See Dkt. 93, Appendix, Exhs. 9, 14, 15, 16, 17). For instance, the July, 2007, Palmer Road Family Line Spill Cleanup Sign–off Sheet states: "By executing this release, the Department of Fish and Game … does not waive any of his/her rights to require the responsible party to conduct additional clean up activities … or any other applicable laws, should additional contamination be discovered … This release also does not preclude other actions required by other agencies with jurisdiction from requiring further action as they deem appropriate." (See Dkt. 92–3, SUF at D28; Dkt. 93, Appendix, Exh. 9). The Spill Response Sign–Off forms for the December 27, 2008, and May 1, 2009, Spring Canyon spills contain similar language. (See Dkt. 92–3, D31, D34; Dkt. 93, Appendix, Exhs. 14,16).

Declaration of Michael Connell in Support of Plaintiffs' Opposition to Motion for Partial Summary Judgment at ¶¶ 4–6). Under defendant's narrow interpretation of "waters of the state," the environmental damage caused by the Six Spills could not be remedied. As plaintiffs stated, "[a] polluter should not escape responsibility for impacting water quality simply because its timing is fortuitous only to itself; the intermittent stream will eventually flow at the surface and with it the residual crude oil and substances left behind from produced waters that resulted from HVI['s] repeated spills." (See Dkt. 92–1, Motion at 59); see also Moses, 496 F.3d at 991 ("Common sense tells us that, ... the mere fact that pollutants are deposited while this part of Teton Creek is dry cannot make a significant difference. To hold otherwise would countenance significant pollution of the waters of the United States as long as the polluter dumped the materials at a place where no water was actually touching them at the time."). In short, the court concludes that "waters of the state" within the meaning of California Water Code § 13350 includes intermittent streams such as the Palmer Road Creek and Spring Canyon Tributary.[27] Therefore, partial summary judgment as to the Six Spills is denied.

## IV. THE REGIONAL BOARD'S SEVENTH CLAIM.

With respect to the Seventh Claim, defendant seeks partial summary judgment

for all claims for volume-based penalties pursuant to California Water Code § 13385(b)(1)(B) and the dismissal of the March 3, 2008, U–Cal spill. (See Dkt. 92–1, Motion at 51). The Regional Board did not oppose dismissal of the volume-based penalty claims or the March 3, 2008, U–Cal spill in its opposition papers. (See, generally, Dkt. 92–1, Motion; Dkt. 111, Plaintiffs' Suppl.). Accordingly, the court will grant summary adjudication in defendant's favor as to the Seventh Claim with respect to the claims for volume-based penalties pursuant to California Water Code § 13385(b)(1)(B) and the March 3, 2008 U–Cal spill.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT defendant's Motion for Partial Summary Judgment (**Document 92**) is **granted in part** and **denied in part**. The Motion is **granted** as to the Regional Board's Seventh Claim based on volume-based penalty claims or the March 3, 2008, U–Cal spill. The Motion is **denied** as to all other claims.

---

**27.** This conclusion is also supported by the Regional Board's interpretation of "waters of the state," which has historically included water bodies that are intermittent. (See Dkt. 92–1, Motion at 59–60; Dkt. 94, Appendix, Exh. 30, Declaration of Matthew Mitchell in Support of Plaintiffs' Opposition to Motion for Partial Summary Judgment Exh. B (Basin Plan)). The Regional Board's interpretation is entitled to deference under the circumstances here. See, e.g., Cal. Pub. Interest Research Grp. v. Shell Oil Co., 840 F.Supp. 712, 718

(N.D. Cal. 1993) (In the context of pollution discharge permits under the CWA, the Water Board's "construction of [a pollution discharge] permit is clearly reasonable, given both the language and underlying purpose of the permit; as such, it deserves substantial deference in this instance.") Like the case here, the court in Shell Oil noted that the defendant failed to "proffer[ ] any persuasive reason as to why this interpretation should be rejected." Id.